

# *In the*
# *Missouri Court of Appeals*
## *Western District*

| | | |
|---|---|---|
| DAVID B. KARR,<br>INDIVIDUALLY AND ON BEHALF<br>OF OTHERS SIMILARLY SITUATED, | ) <br> ) <br> ) <br> ) | |
| Appellant-Respondent, | ) <br> ) | WD86550<br>Consolidated with WD86566 |
| V. | ) <br> ) | OPINION FILED:<br>SEPTEMBER 24, 2024 |
| KANSAS CITY LIFE<br>INSURANCE COMPANY, | ) <br> ) <br> ) | |
| Respondent-Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable John M. Torrence, Judge

Before Division One: Edward R. Ardini, Jr., Presiding Judge and Mark D. Pfeiffer,
Judge and Cynthia L. Martin, Judge

Kansas City Life Insurance Company ("KCL") filed an appeal following the entry

of a final judgment after a jury awarded breach of contract damages to David B. Karr

("Karr"), individually, and on behalf of the members of a class in the amount of

$28,362,830.96. On appeal, KCL challenges the trial court's grant of partial summary

judgment in favor of Karr on the issue of breach of contract liability; the trial court's grant

of Karr's summary judgment and denial of KCL's motion for summary judgment on the

affirmative defense of the statute of limitations; the trial court's rejection of KCL's

affirmative defense that Karr's lawsuit should be stayed based on the primary jurisdiction doctrine; the trial court's denial of KCL's motion for judgment notwithstanding the verdict because there was insufficient evidence to establish damages for breach of contract; the trial court's certification of a class and denial of a motion to decertify the class because individual issues predominate over common issues; the trial court's denial of KCL's motion for new trial because the trial court erroneously excluded KCL's expert witness testimony about an alternative damage calculation; and the denial of KCL's motion for new trial because Karr's comment during closing argument about the absence of an alternative damage calculation was manifestly unjust.

Karr filed a cross-appeal challenging the trial court's interim post-verdict judgment denying his request for an award of prejudgment interest on the jury's award of breach of contract damages.

The trial court's denial of an award of prejudgment interest is reversed and this matter is remanded to the trial court for the limited purpose of determining a prejudgment interest award and entering an amended final judgment reflecting that award. In all other respects the trial court's final judgment is affirmed.

### Factual and Procedural Background

This case involves universal life insurance policies issued by KCL ("Policies"). The Policies provide for a death benefit like traditional term life insurance but also accumulate a cash value which earns interest, which can be borrowed against or withdrawn by the policyholder, and which is paid out to the policyholder if a policy is terminated or surrendered.

2

Karr filed suit individually, and on behalf of other similarly situated policyholders, in the Circuit Court of Jackson County, Missouri against KCL. In an amended petition, Karr asserted three claims for breach of contract relating to how the accumulated cash value for the Policies had been calculated.[1] Karr argued that KCL breached the Policies by reducing each Policy's monthly cash value by an overstated monthly deduction comprised of a "cost of insurance" amount and a "monthly expense charge." Count I argued that the cost of insurance provisions in the Policies required the monthly cost of insurance rate ("COI rate"), a factor used to calculate the monthly cost of insurance, to be based on mortality risk factors and that KCL breached the Policies by considering non-mortality factors like expense recovery and profit generation to determine the monthly COI rate. Count II argued that the monthly expense charge provisions in the Policies specified a fixed dollar amount that could be included in the monthly deduction subtracted from cash value and that KCL breached the Policies by also considering expense recovery in calculating monthly COI rates. Count III argued that the Policies required the COI rate to be calculated based on KCL's expectations regarding future mortality experience and that KCL breached the Policies by failing to adjust monthly COI rates as its expectations regarding future mortality experience improved.

The trial court certified a class, over KCL's objection, whose definition was later amended to be as follows:

---

[1]The amended petition also asserted claims for conversion and for a declaratory judgment and injunctive relief. The conversion claim was abandoned by Karr at trial. The declaratory judgment and injunctive relief claim was dismissed by the trial court without prejudice after trial and before the entry of a final judgment.

> All Missouri citizens who own or owned a Better Life Plan, Better Life Plan Qualified, LifeTrack, AGP, MGP, PGP, Chapter One, Classic, Rightrack (89), Performer (88), Performer (91), Prime Performer, Competitor (88), Competitor (91), Executive (88), Executive (91), Protector 50, LewerMax, Ultra 20 (93), Competitor II, Executive II, Performer II, or Ultra 20 (96) life insurance policy issued or administered by [KCL] in the State of Missouri, or its predecessors in interest, that was active on or after January 1, 2002.
>
> Excluded from the Class is [KCL], any entity in which [KCL] has a controlling interest, any of the officers, directors, or employees of [KCL], the legal representatives, heirs, successors, and assigns of [KCL], anyone employed with [Karr's] counsels' firms, any Judge to whom this case is assigned, and his or her immediate family. The Class also excludes the owners of sixty-eight (68) policies who timely requested exclusion from the Class . . . .

(the "Class"). The Class includes Karr and the current and former owners of just over 8,000 Policies.

Before the Class was certified, KCL filed a motion for summary judgment. Relevant to this appeal, KCL argued that the claims asserted by Karr were barred by the affirmative defense of the statute of limitations.

Karr filed a motion for partial summary judgment. Relevant to this appeal, Karr argued that he and the Class were entitled to summary judgment on the issue of liability with respect to the breach of contract claims. Karr also argued that he and the Class were entitled to summary judgment on KCL's affirmative defense of the statute of limitations. KCL opposed Karr's motion and among other things argued that Karr's lawsuit should be stayed based on the primary jurisdiction doctrine in order to permit the Missouri Department of Insurance ("DOI") to determine the meaning of the Policies.

4

The trial court entered an order on February 22, 2022, granting Karr's motion for partial summary judgment on the issue of liability for the breach of contract claims ("February 22, 2022 Order"). The trial court found that the cost of insurance and monthly expense charge provisions in the Policies are unambiguous and that the uncontroverted material facts established that KCL breached the Policies as a matter of law. With respect to Count I in the amended petition, the trial court found that the Policies do not authorize KCL to consider non-mortality factors in setting monthly COI rates and that KCL breached the Policies by admitting it took non-morality factors like expense recovery and profit generation into consideration in calculating monthly COI rates. With respect to Count II in the amended petition, the trial court found that the Policies limit KCL's ability to deduct expenses from monthly cash values to the fixed monthly expense charge identified in the Policies and that KCL breached the Policies by also considering expense recovery in calculating monthly COI rates. With respect to Count III in the amended petition, the trial court found that the Policies required KCL to consider its expectations as to future mortality experience in calculating monthly COI rates and that KCL breached the Policies by failing to reduce monthly COI rates when its expectations as to future mortality experience improved.

The February 22, 2022 Order also granted summary judgment in favor of Karr, and denied summary judgment for KCL, on the affirmative defense of the statute of limitations. The trial court found that the statute of limitations did not begin to run on the breach of contract claims asserted in the amended petition until a reasonably prudent person would have been on notice of a potentially actionable injury. The trial court found

5

that the "unrebutted evidence" demonstrated that KCL never provides policyholders with an explanation for the calculation of monthly COI rates or with expectations as to future mortality experience. The trial court found that as a result, a reasonably prudent policyholder would not be on notice of potentially actionable injury regarding the manner in which KCL calculated monthly COI rates for the Policies. The trial court rejected KCL's contention that because its annual reports show that the cost of insurance increased over time policyholders were on notice that monthly COI rates are calculated in part based on non-mortality factors. The trial court concluded that increasing cost of insurance amounts are consistent with calculating monthly COI rates in a contractually compliant manner since mortality risks worsen as a policyholder ages and that increasing cost of insurance amounts would not put a reasonably prudent policyholder on notice that non-mortality factors like expense recovery and profit generation were being considered in calculating monthly COI rates in violation of the Policies.

Finally, the February 22, 2022 Order also rejected KCL's contention that the primary jurisdiction doctrine required Karr's lawsuit to be stayed pending referral to the DOI of certified questions about the meaning of provisions in the Policies.

After the entry of partial summary judgment on the issue of liability, Karr's breach of contract claims proceeded to a jury trial on the issue of damages. The jury entered verdicts in favor of Karr and the Class, and against KCL, on all three breach of contract claims and awarded monetary damages in the amount of $28,362,830.96 on each claim. The damage award was the exact amount calculated as Class-wide damages by Karr's

6

expert witness, S.W.[2]  It is uncontested that Karr and the Class are only entitled to recover $28,362,830.96 in actual damages by virtue of the duplicative verdicts.

After the verdicts were entered, Karr filed a motion on December 21, 2022, asking for the entry of a judgment on the verdicts and seeking, among other things, an award of prejudgment interest.  Karr used the interest rate payable on accumulated cash values as provided in the Policies and calculated prejudgment interest from and after (but not before) the last policy date which was either the date a policy was terminated for Policies no longer in force or February 28, 2021, for in-force Policies (the last date for which KCL produced policy data).  Karr's expert witness's damage calculation included interest that should have been paid to policyholders on cash values that were improperly reduced by overstated cost of insurance amounts and made that calculation up to (but not after) the date any Policies had terminated or surrendered and up to (but not after) February 28, 2021, for Policies still in force.  Karr's prejudgment interest calculation thus began where his trial expert's testimony about Class-wide damages ended.  According to Karr, the additional prejudgment interest calculation as of December 21, 2022, (the date of Karr's motion) was $13,492,389.41 with that amount continuing to accrue at the daily rate of at least $4,698.66 through the date of entry of a final judgment.  KCL opposed the request for an award of prejudgment interest and argued that Karr's breach of contract claims were not liquidated and would result in a double recovery.

---

[2]Throughout this Opinion, we refer to non-party witnesses by their initials, instead of by their names, as required by section 509.520, which became effective August 28, 2023.

7

Karr's December 21, 2022 motion for the entry of judgment on the verdicts also asked the trial court to include the Class definition in its judgment; to approve a proposed plan for allocation of damages to the Class; and for the establishment of a qualified settlement fund and the appointment of a fund administrator.

Karr filed a second motion on December 21, 2022, requesting an award of attorneys' fees, expense reimbursement, and a service award for Karr.

On May 10, 2023, the trial court entered a "judgment on jury verdict" which acknowledged the jury's verdicts and the amount of damages awarded ("May 10, 2023 Interim Judgment"). The May 10, 2023 Interim Judgment included the Class definition but denied Karr's request for an award of prejudgment interest finding that Karr's breach of contract claims were not liquidated. The May 10, 2023 Interim Judgment did not rule on the other requests set forth in Karr's December 22, 2022 motions and expressly noted that a final judgment would be entered following determination of post-verdict motions.

KCL filed several post-verdict motions on June 9, 2023. KCL filed a motion for judgment notwithstanding the verdict ("JNOV") which argued, relevant to this appeal, that Karr failed to prove damages because his expert witness did not determine what the actual monthly COI rate should have been based on the manner in which the trial court construed the Policies. KCL filed a motion for new trial which argued, relevant to this appeal, that it was error to exclude the testimony of M.M., KCL's expert witness, about an alternative damage calculation. KCL filed a motion for reconsideration of the trial court's February 22, 2022 Order granting partial summary judgment in favor of Karr on

8

the issue of liability on each of the breach of contract claims. And KCL filed a motion to decertify the Class. All of these motions were opposed by Karr.

On August 24, 2023, the trial court entered several orders denying each of KCL's post-verdict motions and an order granting Karr's motion for attorneys' fees, expense reimbursement, and a service award for Karr. On August 24, 2023, the trial court also entered a final judgment ("Judgment"). The Judgment once again acknowledged the jury's verdicts, the amount of the jury's damage award, and the Class definition (all of which were expressed in the May 10, 2023 Interim Judgment) but did not repeat the ruling in the May 10, 2023 Interim Judgment denying an award of prejudgment interest. The Judgment awarded post-Judgment interest at the statutory rate of nine percent per annum; awarded attorneys' fees, expense reimbursement, and a service award to Karr; approved Karr's proposed plan for allocating the damages and interest awards to the Class; established a qualified settlement fund and appointed an administrator for that fund; and ordered that "all other claims, motions, or other prayers for relief are hereby dismissed, overruled, or denied" with specific reference made to KCL's motion for JNOV, motion for new trial, motion for class decertification, and motion for reconsideration of the February 22, 2022 Order. On September 5, 2023,[3] KCL filed a

_____

[3]An appeal must be filed within ten days of the actual or deemed denial of a motion for new trial. *Abbadessa v. Tindall*, 763 S.W.2d 178, 179 (Mo. App. W.D. 1988). Though KCL's appeal was filed twelve days after the trial court's entry of the Judgment formally denying KCL's post-verdict motions, KCL's notice of appeal was nonetheless timely filed as September 3, 2023, was a Sunday, and September 4, 2023, was a holiday. Rule 44.01(a) (noting that in computing time periods prescribed by the Missouri Rules of Civil Procedure, the last day of the period so computed is to be included unless it is a

9

notice of appeal.[4]  On September 11, 2023, Karr filed a notice of cross-appeal.[5]  The appeals were consolidated.

Additional facts and procedural history will be addressed as relevant in connection with our discussion of the points on appeal asserted in this cross-appeal.

**Summary of Points on Appeal**

Karr's cross-appeal challenges the trial court's May 10, 2023 Interim Judgment denying his request individually, and on behalf of the Class, for an award of prejudgment interest. [6]

---

Sunday or a legal holiday, in which event the time period runs until the end of the next day).

All Rule references are to *Missouri Court Rules, Volume 1 -- State, 2023* unless otherwise noted.

[4]Out of an abundance of caution, on September 1, 2023, KCL refiled its motion for JNOV, motion for new trial, motion for class decertification, and motion for reconsideration of the February 22, 2022 Order.  The motions filed on that date were identical to the motions KCL filed on June 9, 2023.  The refiled motions are of no import here, as "once the trial court . . . ruled on the [first-filed] motion for new trial it was without [authority] to set that ruling aside and to later enter a new ruling." *Abbadessa*, 763 S.W.2d at 179.  Nonetheless, on December 5, 2023, the trial court entered an order that denied KCL's refiled motions and that approved a supersedeas bond staying enforcement of the Judgment. The December 5, 2023 order is a legal nullity to the extent it addressed KCL's refiled post-verdict motions as upon the filing of a notice of appeal after a final judgment is entered "a trial court loses almost all jurisdiction over a case . . . [except] to exercise functions of a purely ministerial or executive nature." *Sanford v. CenturyTel of Mo., LLC*, 490 S.W.3d 717, 721 n.3 (Mo. banc 2016) (brackets in original) (quotation omitted).

[5]Rule 81.04(c) permits a cross-appeal to be filed within ten days of the date the first notice of appeal was filed.

[6]Although Karr filed a cross-appeal, the parties were realigned pursuant to Western District Special Rule 43 which provides that in cross-appeals "the plaintiff in the court below shall be deemed the appellant for purposes of briefing unless the parties otherwise agree or the court otherwise orders."

KCL's appeal raises nine challenges. Points One, Two and Three challenge the trial court's February 22, 2022 Order granting partial summary judgment on the issue of liability for the breach of contract claims asserted in Counts I, II, and III of the amended petition. Point Four challenges the trial court's February 22, 2022 Order rejecting the affirmative defense of the statute of limitations. Point Five challenges the trial court's February 22, 2022 Order rejecting KCL's request to stay Karr's lawsuit pursuant to the primary jurisdiction doctrine. Point Six challenges the trial court's denial of KCL's JNOV motion which argued that there was insufficient evidence of damages presented by Karr at trial. Point Seven challenges the trial court's initial certification of the Class and later denial of KCL's motion to decertify the Class because individual issues predominate over common issues. Point Eight challenges the trial court's denial of KCL's motion for new trial because the trial court erroneously excluded KCL's expert witness's testimony about an alternative damage calculation as a sanction for discovery conduct. Point Nine challenges the denial of KCL's motion for new trial because Karr's closing argument commented on the absence of alternative damage calculation evidence resulting in a manifest injustice.[7]

_____

[7]Karr's single point on appeal, and KCL's points one, two, three, four, five, and seven on appeal, claim trial court errors with respect to interlocutory orders and judgments entered by the trial court prior to entry of the August 24, 2023 Judgment. Those interlocutory orders and judgments became eligible for appeal upon the entry of the Judgment. *State ex rel. Koster v. ConocoPhillips Co.*, 493 S.W.3d 397, 401 (Mo. banc 2016) (holding that "a final judgment necessarily incorporates all prior orders or judgments that adjudicated some—but fewer than all—of the claims and the rights and liabilities of all the parties . . . regardless of whether such incorporation is addressed explicitly (or implicitly) in the final judgment itself").

11

Because Karr's challenge to the trial court's denial of an award of prejudgment interest may be rendered moot by our disposition of some or all of KCL's claims of trial court error, we first address KCL's points on appeal.

## I.

## KCL's Points on Appeal

## A.

***The trial court did nor error in granting Karr's motion for partial summary judgment on the issue of liability on Karr's breach of contract claims because the uncontroverted facts establish that KCL breached the unambiguous cost of insurance and monthly expense charge provisions in the Policies (Points One, Two, and Three)***

### Standard of Review

We review the trial court's grant of summary judgment *de novo*. *Green v. Fotoohighiam*, 606 S.W.3d 113, 115 (Mo. banc 2020). "In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper." *Id.* (internal quotation omitted). "Summary judgment is proper if the moving party establishes there is no genuine issue as to the material facts and the movant is entitled to judgment as a matter of law." *Sachtleben v. Alliant Nat'l Title Ins. Co.*, 687 S.W.3d 624, 629 (Mo. banc 2024) (citing *Green*, 606 S.W.3d at 115). Summary judgment is frequently used to resolve issues involving the interpretation of insurance policy provisions. *Bland v. Progressive Cas. Ins. Co.*, 665 S.W.3d 424, 428 (Mo. App. S.D. 2023).

"The interpretation of an insurance policy is a question of law that this Court also determines *de novo*." *Sachtleben*, 687 S.W.3d at 629 (quoting *Seaton v. Shelter Mut. Ins.*

12

*Co.*, 574 S.W.3d 245, 247 (Mo. banc 2019) (internal quotation omitted)). "Insurance policies are read as a whole. . . ." *Id.* at 630 (quoting *Owners Ins. Co. v. Craig*, 514 S.W.3d 614, 617 (Mo. banc 2017)). "When interpreting an insurance policy, this Court gives the policy language its plain meaning, or the meaning that would be attached by an ordinary purchaser of insurance." *Id.* at 629-30 (quoting *Seaton*, 574 S.W.3d at 247). "A policy must be enforced as written when its language is clear and unambiguous." *Id.* at 630 (quoting *Seaton*, 574 S.W.3d at 247). "When policy language is clear and unambiguous, . . . this Court will not resort to canons of construction." *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 344 (Mo. banc 2015) (internal citation omitted). "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Sachtleben*, 687 S.W.3d at 630 (quoting *Seaton*, 574 S.W.3d at 247). However, "[c]ourts may not unreasonably distort the language of a policy or exercise inventive powers for the purpose of creating an ambiguity when none exists." *Id.* (quoting *Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. banc 2007)). "When language [in an insurance policy] is ambiguous, it is construed against the insurer." *Taylor*, 457 S.W.3d at 344 (internal citation omitted).

### Analysis of Points One and Two

In its first point on appeal, KCL argues that the trial court erred by denying its motion for summary judgment and granting Karr's because KCL was entitled to judgment as a matter of law on Count I of the amended petition in that the Policies do not exclude consideration of non-mortality factors in calculating monthly COI rates. In its second point on appeal, KCL argues that the trial court erred by denying its motion for summary

13

judgment and granting Karr's because KCL was entitled to judgment as a matter of law on Count II of the amended petition in that the Policies do not limit KCL from considering expenses in determining monthly COI rates. We consider KCL's first and second points on appeal collectively.

KCL's first and second points on appeal improperly claim error in the trial court's denial of KCL's motion for summary judgment and error in the trial court's failure to enter judgment in KCL's favor as a matter of law on the issue of liability on Counts I and II of the amended petition. A trial court's denial of a motion for summary judgment is not appealable even after the entry of a final judgment. *Stacy v. Bar Plan Mutual Insurance Co.*, 522 S.W.3d 914, 918 (Mo. App. E.D. 2017). The only exception to this general rule is when the merits of a denied summary judgment motion are "completely intertwined with a grant of summary judgment in favor of the opposing party." *Id.* (quoting *Iowa Steel & Wire Co., Inc. v. Sheffield Steel Corp.*, 227 S.W.3d 549, 558 (Mo. App. W.D. 2007)).

The exception to the general rule does not apply here. KCL's motion for summary judgment did not seek judgment as a matter of law on Karr's breach of contract claims based on argued interpretations of the Policies that would negate liability. Though KCL's response to Karr's motion for partial summary judgment opposed Karr's urged construction of these provisions in the Policies, that challenge would have been insufficient to support entering judgment in KCL's favor as a matter of law had the trial court denied Karr's motion for partial summary judgment. *Moore v. Sw. Bell Tel. Co.*, 684 S.W.3d 187, 211-212 (Mo. App. E.D. 2023) (citations omitted) (holding that trial

14

court does not have authority pursuant to Rule 74.04 to enter summary judgment in favor of a non-movant even when summary judgment is properly denied for a movant when the non-movant has not filed a cross motion for summary judgment on the same issue). We disregard, therefore, KCL's first and second points on appeal to the extent they claim error in the denial of KCL's motion for summary judgment and error in failing to enter judgment in KCL's favor as a matter of law. We address only KCL's contention that it was error to grant partial summary judgment in favor of Karr on the issue of breach of contract liability because the Policies did not preclude KCL from considering non-mortality factors, including expense recovery and profit generation, in determining monthly COI rates.

Several provisions in the Policies are relevant to addressing the merits of KCL's first and second points on appeal[8] and are thus relevant to determining "the meaning that would be attached by an ordinary purchaser of insurance" to the Policies. *Sachtleben*, 687 S.W.3d at 630 (quoting *Seaton*, 574 S.W.3d at 247). Section 10.2 of the Policies expresses the cash value for the Policies as of each Policy's monthly anniversary date as a

---

[8]Twenty-three insurance products on twelve different policy forms are included in the Policies within the Class definition. Slight variances in the cost of insurance and expense provisions in the policy forms do exist but the variances are not material to any of the issues on appeal. The policy section references in this Opinion refer to Karr's policy form and may vary from the section references in other policy forms though the policy language at issue is essentially the same in all of the Policies.

formula, A + B + C - D.  Relevant to this case, "D" is the "monthly deduction" that can

be subtracted from the sum of A + B + C[9] to arrive at the cash value each month.

Section 4.13 of the Policies defines "monthly deduction" as:

> The amount we deduct on the monthly anniversary day from the cash value
> to pay the *cost of insurance*, *expenses* and the cost of any additional
> benefits provided by riders for the month beginning on that monthly
> anniversary day.

(Emphasis added.)  The definition of "monthly deduction" thus includes and

differentiates between two components: the cost of insurance and expenses.  Consistent

with this definition, section 10.4 of the Policies expresses the "monthly deduction" as a

formula, X + Y + Z.  Relevant to this case, "X" is "the cost of insurance" and "Y" is "the

current monthly expense charge for the appropriate policy year."[10]

With respect to the cost of insurance component of the "monthly deduction,"

section 4.11 of the Policies defines "cost of insurance" as:

> The charge [KCL] make[s] for providing pure insurance protection using
> the *current cost of insurance rates* for this policy.  It does not include the
> cost of any additional benefits provided by riders.

(Emphasis added.)  Section 10.6 of the Policies expresses "cost of insurance" as a

formula, Q x (R - S), where Q is "the *cost of insurance rate (as described in Section 3)*,"

R is "the Insured's death benefit on that day divided by no less than 1.0024663," and S is

"the cash value prior to subtracting the cost of insurance."  (Emphasis added.)  The COI

---

[9]"A" is the cash value on the preceding monthly anniversary.  "B" is the net
premiums received since the preceding monthly anniversary.  "C" is the interest earned
on "A" and "B".

[10]"Z" is the current expense charge for increase in specified amount, applicable if a
policy's death benefit amount is increased.  "Z" is not relevant to this case.

16

rate is thus one of three factors considered in determining the "cost of insurance" with the cost of insurance then included in the "monthly deduction" subtracted from cash value each month. Central to this case is how the COI rate is supposed to be determined. The higher the monthly COI rate, the higher the cost of insurance amount that is deducted monthly from a policyholder's cash value with the result being a lower accumulated cash value available for the policyholder.

Section 3 in the Policies sets forth a table of guaranteed maximum monthly COI rates per $1000 and describes the COI rate as follows:

> ***The cost of insurance rate on each monthly anniversary day is based on the Insured's sex, age and risk class***. Age means the age on the Insured's last birthday. The guaranteed maximum monthly cost of insurance rates per $1,000 shown in the table below are based on the Commissioners 1958 Standard Ordinary Mortality Table, age last birthday.

> ***Monthly cost of insurance rates actually used will be determined by [KCL] based on [KCL's] expectations as to future mortality experience***, but these rates will never be greater than those shown below. However, the guaranteed maximum monthly cost of insurance rates for special risk classes will be adjusted appropriately.

(Emphasis added.)

With respect to the monthly expense charge component of the "monthly deduction," section 4.12 of the Policies defines "expense charges" as:

> ***The amount [KCL] deduct[s] to cover [KCL's] expenses***. The premium expense charge is the amount we deduct from each premium payment. ***The monthly expense charge is included in the monthly deduction***. These charges are shown on page 4.

(Emphasis added.) "Expenses charges" thus include premium expense charges deducted from all premium payments and a monthly expense charge included in the monthly deduction subtracted from cash value. Section 10.5 of the Policies also addresses "expense charges" and relevant to this case provides:

> The *current monthly expense charge* and the current increase expense charge are shown on page 4. These expense charges will be determined by us based on our expectations as to future expenses. However, *any percentage increase in these current expense charges* over that shown on page 4 will not be greater than the percentage increase over the same period in the Consumer Price Index for Urban Wage Earners and Clerical Workers-All Items . . . .

(Emphasis added.) On page 4 of the Policies the "current monthly expense charge" is stated as a fixed dollar amount per month for the first policy year and then a different fixed dollar amount per month after the first policy year. This same section contemplates the possibility of an increase in the monthly expense charge at a fixed dollar amount per $1,000 increase in specified amount of the death benefit.

Read together these provisions in the Policies explain that cash value is calculated monthly after subtracting an authorized monthly deduction; that (relevant to this case) the monthly deduction is the sum of the monthly cost of insurance and a monthly expense charge; that the monthly expense charge is a fixed dollar amount, and, along with the premium expense charge,[11] is "the amount [KCL] deduct[s] to cover our expenses;" that the monthly cost of insurance is calculated by multiplying the monthly COI rate

---

[11]As noted in the definition of "expense charges," the monthly premium expense charge is deducted from each premium payment. It is a separate means by which KCL is authorized to recover expenses but it is not a part of the "monthly deduction" subtracted from monthly cash value.

18

described in Section 3 by the difference between two other factors in the "cost of insurance formula;" and that the COI rate "is based on the Insured's sex, age, and risk class" and is "based on [KCL's] expectations as to future mortality experience."

Karr argued in its motion for partial summary judgment that these Policy provisions are unambiguous. Relevant to Counts I and II in the amended petition, Karr argued that the Policies unambiguously treat the cost of insurance and the monthly expense charge as separate and distinct components of the authorized monthly deduction that can be subtracted from cash value. Karr argued that Section 3 assures that monthly COI rates, which are then used to calculate the monthly cost of insurance, will be determined based on the stated mortality factors and KCL's expectations as to future mortality experience and that the plain language of these provisions precludes consideration of non-mortality factors (including profit generation and expense recovery) in determining monthly COI rates. Karr also argued that the fixed monthly expense charge shown on page 4 of the Policies is the only expense recovery permitted to be considered in calculating the "monthly deduction" and, thus, the only expense charge that can be subtracted from cash value solidifying the conclusion that expense recovery (a non-mortality factor) cannot be considered in calculating monthly COI rates. As such, Karr argued that the plain language of the Policies do not authorize monthly COI rates to be calculated based on consideration of non-mortality factors including profit generation and expense recovery.

KCL argued in its response to Karr's motion for partial summary judgment that the phrase "based on" in section 3's discussion of the COI rate does not exclude the

19

possibility that KCL will consider non-mortality factors like profit generation and expense recovery in setting COI rates because the plain meaning of "based on" is not "based solely on."  KCL alternatively argued that the phrase "based on" is ambiguous and that a construction of the phrase that limits the calculation of monthly COI rates to consideration of the mortality factors mentioned in Section 3 of the Policies would be inconsistent with extrinsic evidence.

The trial court found in the February 22, 2022 Order that the cost of insurance and expense provisions in the Policies are unambiguous and do not authorize KCL to consider non-mortality factors in determining monthly COI rates.  With respect to Count I of the amended petition, the trial court found that the Policies state that monthly COI rates are based on sex, age, and risk class, which are characteristics of insureds that bear on their mortality risk and that the Policies consistently state that COI rates "will be determined by [KCL] based on [KCL's] expectations as to future mortality experience." The trial court concluded that the Policies unambiguously prohibit KCL from using undisclosed non-mortality factors to determine COI rates.[12]  The trial court acknowledged

_____

[12]The trial court cited several decisions from other courts that have reached similar conclusions after interpreting similar cost of insurance provisions.  Both parties in this case have spent considerable time in their appellate briefs discussing the outcomes reached in trial court cases and appellate decisions from across the country involving disputes over the determination of COI rates in similar universal life insurance policies. These cases and decisions, though of interest, have had no influence on and are not controlling with respect to our obligation to conduct independent *de novo* review of the Policies.  "The interpretation of an insurance policy is a question of law that this Court . . . determines *de novo*." *Sachtleben v. Alliant Nat'l Title Ins. Co.*, 687 S.W.3d 624, 629 (Mo. banc 2024) (quoting *Seaton v. Shelter Mut. Ins. Co.*, 574 S.W.3d 245, 247 (Mo. banc 2019)).

but rejected KCL's argument that the phrase "based on" in the COI rate provision is ambiguous but alternatively held that even if the phrase "based on" is ambiguous under Missouri law the ambiguity would be construed against KCL.

With respect to Count II of the amended petition, the trial court found that the Policies unambiguously define the monthly expense charge as a fixed dollar amount and that no reasonable policyholder would understand the Policies to permit KCL to deduct expenses from cash value each month in excess of that fixed dollar amount. The trial court found that permitting KCL to also deduct expenses from cash value each month by considering expense recovery in determining the monthly COI rate (and thus the cost of insurance component of the monthly deduction) would render the unambiguous monthly expense charge provisions meaningless.

Because KCL conceded that it considers non-mortality factors like expense recovery and profit generation in calculating monthly COI rates for the Policies, the trial court concluded that the uncontroverted facts established that KCL breached the Policies. The trial court thus granted partial summary judgment in favor of Karr on the issue of liability for the breach of contract claims asserted in counts I and II of the amended petition.

On appeal, KCL does not challenge the trial court's conclusion that the cost of insurance and monthly expense charge provisions of the Policies are unambiguous.[13]

---

[13]On appeal, KCL has thus abandoned the argument it made in its response to Karr's motion for partial summary judgment that the phrase "based on" as used in the COI rates provisions is ambiguous and that extrinsic evidence would require resolution of

21

Instead,[14] KCL argues that the trial court committed legal error by reaching an erroneous conclusion about the meaning of the unambiguous provisions of the Policies.[15] KCL argues that the cost of insurance and monthly expense charge provisions in the Policies read together and in context show that KCL did not breach the Policies because limiting KCL to mortality factors in calculating COI rates is inconsistent with the Policies as a whole, is logically impossible, and renders other provisions of the Policies superfluous. *See DeBaliviere Place Ass'n v. Veal*, 337 S.W.3d 670, 676-77 (Mo. banc 2011) (holding that "[i]n an unambiguous contract, the intent of the parties is to be discerned from the contract alone"). The issue squarely framed by KCL's first and second points on appeal, therefore, is whether the unambiguous cost of insurance and monthly expense charge provisions in the Policies permitted KCL to consider non-mortality factors like expense recovery and profit generation in calculating monthly COI rates. We resolve this issue

the ambiguity in KCL's favor. KCL has thus not challenged the trial court's conclusion that ambiguities in the Policies, even if they existed, would be construed against KCL.

[14]KCL's position has varied considerably throughout this case. As noted, in response to Karr's motion for partial summary judgment KCL relied heavily on the argument that the phrase "based on" was ambiguous and that extrinsic evidence established a meaning for the ambiguous phrase that permits consideration of non-mortality factors in determining COI rates. In its post-verdict motion for reconsideration of the February 22, 2022 Order, KCL argued that genuine issues of material fact remained in dispute preventing the entry of summary judgment on the issue of liability on the breach of contract claims. Now, on appeal, KCL has abandoned these previously asserted contentions and embraces the trial court's finding that the Polices are unambiguous though KCL disagrees with the meaning ascribed to the unambiguous provisions by the trial court.

[15]The fact that KCL disagrees with the trial court's interpretation of the Policies does not render the Policies ambiguous. *Shelter Mut. Ins. Co. v. Ballew*, 203 S.W.3d 789, 794 (Mo. App. W.D. 2006) (holding that an insurance policy is not rendered ambiguous because the parties disagree about its correct interpretation).

22

through the required lens of an ordinary purchaser of insurance. *Sachtleben*, 687 S.W.3d at 629-30 (quoting *Seaton*, 574 S.W.3d at 247).

KCL argues that the Policies read as a whole require the conclusion that non-mortality factors can be considered in calculating monthly COI rates. KCL argues that although monthly COI rates are to be "determined . . . based on [KCL's] expectations as to future mortality experience" the provision "does not specify any method or formula for COI rates." [KCL's brief, p. 29]. That is true. However, it does not follow, as KCL summarily argues, that the absence of a specified formula in the Policies means that KCL has the "preserve[d] . . . discretion to set rates using its complex, holistic actuarial process." [KCL's brief, p. 29]. Though the specific formula for calculating the monthly COI rate is not set forth in the Policies, the factors permissibly considered in that calculation are set forth in the Policies. KCL's argument ignores this controlling point. An ordinary purchaser of insurance would not know from the Policies exactly how COI rates are calculated but they would understand from the plain language of the Policies what the COI rates are based on. In fact, the COI rate provision in section 3 of the Policies represents the only language in the Policies which speaks to the determination of monthly COI rates and plainly states that COI rates will be "based on" sex, age, and risk class (conceded mortality factors), and KCL's expectations as to future mortality experience. An ordinary purchaser of insurance would have no reason to conclude from this plain language that non-mortality factors will be considered in determining monthly COI rates.

23

Next, KCL argues that limiting the calculation of COI rates to mortality factors creates inconsistencies in the Policies as a whole and renders other sections of the Policies superfluous. [KCL's brief, p. 31]. KCL first makes the confusing argument that if "based on" means exclusively then the use of "based on" to first refer to "sex, age, and risk class" and to next refer to "expectations of future mortality experience" is inconsistent because the phrase "mortality experience" is not necessarily limited to the mortality factors of sex, age, and risk class. This argument is a red herring that completely misses the point. The plain language of the Policies would lead an ordinary purchaser of insurance to conclude that monthly COI rates are calculated based on mortality factors whatever those mortality factors may be. The plain language of the Policies does not alert an ordinary purchaser of insurance that non-mortality factors like profit generation and expense recovery will be considered in calculating COI rates. It is KCL's consideration of non-mortality factors in determining monthly COI rates that is at issue here.

KCL then argues that many forms of the Policies "expressly exclude two financial metrics as inputs" in the calculation of COI rates and that the absence of mention of other financial metrics requires the conclusion that the unmentioned financial inputs can be used as factors in calculating monthly COI rates. [KCL brief, p. 37]. KCL is referring to language that does not appear in the discussion of COI rates in section 3 of Karr's policy form, but that does appear in a similar section in eleven of the twelve policy forms included in the Class, to the effect that "[t]he current cost of insurance rates will never be increased to recover losses incurred, or decreased to distribute gains realized." [KCL

24

brief, pp. 37, 41]. Perplexingly, KCL believes this policy provision helps its cause. We disagree. The provision, plainly read, speaks of losses and gains, terms commonly associated with the concept of "profits." The provision thus expressly precludes consideration of profit generation in the calculation of monthly COI rates. Though the provision relied on by KCL does not mention the financial metric of "expense recovery," it does not need to. We have already explained that other unambiguous provisions of the Policies make clear that the "monthly expense charge" is a distinct component of the authorized "monthly deduction" that can be subtracted from cash value and that the "monthly expense charge" is a fixed dollar amount that represents the only expenses that can be included in the monthly deduction and subtracted from cash value. The policy provision referring to losses and gains that KCL relies on combines with the monthly expense provisions in the Policies to confirm that an ordinary purchaser of insurance would not believe that KCL can consider non-mortality factors like expense recovery and profit generation in determining monthly COI rates.

Next, KCL argues that the trial court erroneously employed an *expresso unius* argument to conclude that because the Policies only list mortality factors when referring to the calculation of COI rates, then it must be concluded that non-mortality factors are excluded from consideration. [KCL brief, p. 35]. But, the trial court made no reference to this maxim. Even had it, we would not find application of the maxim here to be erroneous. As KCL notes, the maxim of *expresso unius* "is to be used with great caution" and "should be invoked only when it would be natural to assume by a strong contrast that that which is omitted must have been intended for the opposite treatment." *Six Flags*

25

*Theme Parks, Inc. v. Director of Revenue*, 179 S.W.3d 266, 270 (Mo. banc 2005) (citations omitted). Here, mortality factors and non-mortality factors (like expense recovery and profit generation) stand in "strong contrast" to one another making it natural to assume that the express reference to one (mortality factors) intends an opposite treatment for the other (non-mortality factors). Consistent with this conclusion is the fact that the Policies treat the monthly expense charge and the cost of insurance as independent components of the "monthly deduction" authorized to be subtracted from cash value leading an ordinary purchaser of insurance to conclude that the components stand in strong contrast to one another and that "expenses" will not be a factor in calculating monthly COI rates.

Next, KCL argues that it is not logical to conclude that COI rates exclude non-mortality factors from consideration. [KCL brief, p. 38]. KCL argues that "some sort of financial information is a logical necessity for an insurer to develop its rates." [KCL brief, p. 39]. KCL argues that common sense would lead an ordinary purchaser of insurance to understand that insurers consider expenses and profits in calculating the cost of insurance and, thus, would lead an ordinary purchaser of insurance to understand that "based on" as used in the COI rates provision in section 3 of the Policies does not preclude consideration of non-mortality factors like profits and expenses.

We agree that an ordinary purchaser of insurance could be expected to understand that an insurer hopes to make a profit and could be expected to understand that in order to do so an insurer must recover its expenses. We do not agree, however, that an ordinary purchaser of the Policies would know or understand that KCL planned to generate profit

26

and recover expenses through the calculation of a monthly COI rate as the Policies say nothing to that effect and use plain language to the contrary. An ordinary purchaser of the Policies would be more likely to anticipate that profit generation and expense recovery are factors considered by KCL in setting the premiums an insured is expected to regularly pay to purchase and maintain the Policies and in setting the monthly "premium expense charge" that is deducted from each premium payment as explained in the definition of "expense charges" in section 4.12 of the Policies.[16] On page 4 of the Policies, the "premium expense charge" is noted as a fixed percentage amount to be deducted from each premium payment to result in a net premium. In the A + B + C - D formula for calculating cash value set forth in section 10.2 of the Policies, "B" is the "net premiums received since the preceding monthly anniversary day" and is distinct from "D" which is the "monthly deduction" to be subtracted from the sum of A + B + C to calculate the monthly cash value. The collective import of these unambiguous provisions would lead an ordinary purchaser of insurance to conclude that the premiums paid for the Policies, the fixed premium expense charge deducted from premiums paid, and the fixed monthly expense charge subtracted from cash value as a part of the monthly deduction, represent the means by which KCL generates profit and recovers its expenses. We are unpersuaded that an ordinary purchaser of insurance would expect or understand that

---

[16]As previously noted, the definition of "expense charges" in section 4.12 of the Policies is "[t]he amount [KCL] deduct[s] to cover [KCL's] expenses" through the "premium expense charge . . . [KCL] deduct[s] from each premium payment" and the "monthly expense charge . . . included in the monthly deduction."

KCL is also authorized by the Policies to calculate monthly COI rates used to determine the monthly cost of insurance by considering expense recovery and profit generation.

In a related vein, KCL argues that the trial court "invented" a limitation on expense recovery by reading the definition of "expense charges" in section 4.12 to be limited to recovering expenses from the premium expense charge and the monthly expense charge. [KCL's brief, pp. 46-48]. KCL accuses the trial court of implying an obligation not to recover any expenses through calculation of the monthly COI rate and cites to the definition of "cost of insurance" in section 4.11 of the Policies as charges "for providing pure insurance protection." KCL summarily argues that "surely" the words "'for providing' . . . communicate an expense." [KCL brief, p. 47-48]. We are unpersuaded by KCL's attempt to blur plain language. The definition of "expense charges" is, in plain terms, "the amount we deduct to cover our expenses" and describes the two "deductions" that are being referred to--the "premium expense charge" deducted from premiums as they are paid and the "monthly expense charge" included in the monthly deduction subtracted from cash value. Had KCL intended an ordinary purchaser of insurance to understand that "expense charges" might also be "deducted" as a part of the monthly COI rate, it could easily have said so. It did not. The trial court did not "invent" a limitation on "expense charges." It simply held KCL to the plain language of its Policies. That conclusion is underscored by the fact that although "cost of insurance" is, as KCL notes, defined in section 4.11 of the Policies as the "charge we make for providing pure insurance protection," KCL neglects to mention that the definition continues to state that said charge is calculated "***using the current cost of insurance***

28

*rates for this policy*."  (Emphasis added.)  We have already explained that "cost of insurance" is distinctly and purposefully differentiated from the "monthly expense charge" throughout the Policies and that the COI rate used to calculate the cost of insurance is determined based only on mortality factors.  The plain language in the Policies does not support KCL's self-serving conclusion that "for providing" in the definition of "cost of insurance" communicates an expense.  In fact, it communicates the contrary.

Finally, KCL argues that the trial court relied on a wrongly-decided decision interpreting different policy language, referring to *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753 (8th Cir. 2020), where the Eighth Circuit concluded that a provision in State Farm universal life policies, which states that COI rates will be based on age, sex, and risk class as well as expectations of future mortality experience, conveys that mortality factors are the exclusive inputs for COI rate determination.  [KCL brief, p. 43].  We do not read the February 22, 2022 Order to suggest that the trial court relied on *Vogt* to conclude that the Policies are unambiguous and preclude consideration of non-mortality factors in the calculation of monthly COI rates.  Though the February 22, 2022 Order refers to *Vogt* to bolster the trial court's conclusions in part,[17] even a cursory review of the February 22, 2022 Order reflects that the trial court conducted an independent *de novo*

_____

[17]We say "in part" because the Eighth Circuit in *Vogt v. State Farm Life Ins. Co.* concluded that State Farm policy provisions addressing the cost of insurance, COI rate calculation, and expense recovery were "at the very least" ambiguous and, thus, construable against the insured. 963 F.3d 753, 763 (8th Cir. 2020).  This conclusion varies from the trial court's conclusion that similar provisions in the KCL Policies are unambiguous.

29

analysis of the Policies to reach its conclusions as it was required to do. "The interpretation of an insurance policy is a question of law that this Court . . . determines *de novo*." *Sachtleben*, 687 S.W.3d at 629 (quoting *Seaton*, 574 S.W.3d at 247). It is thus irrelevant whether *Vogt* was wrongly decided, as KCL argues.

For the reasons set forth above, the trial court did not error in entering partial summary judgment in favor of Karr on the issue of liability for the breach of contract claims asserted as Counts I and II in the amended petition. The plain meaning of the unambiguous provisions of the Policies, reading the Policies as a whole, would lead an ordinary purchaser of insurance to conclude that monthly COI rates will be calculated based on mortality factors and not based on the non-mortality factors of expense recovery and profit generation.

Points One and Two are denied.

**Analysis of Point Three**

In its third point on appeal, KCL argues that the trial court erred by denying its motion for summary judgment and granting Karr's because KCL was entitled to judgment as a matter of law on claims it breached its Policies in that the Policies do not obligate KCL to update COI rates for evolving mortality experience. This point addresses the claim for breach of contract alleged in Count III of Karr's amended petition.

For the reasons described in addressing KCL's first and second points on appeal, we disregard KCL's claims of error relating to the denial of its motion for summary judgment and the failure to enter judgment on the issue of liability in its favor as a matter of law. We address only KCL's contention that it was error to grant summary judgment

30

in favor of Karr on the issue of liability on Count III of the amended petition because the Policies did not obligate KCL to update COI rates for evolving mortality experience.

A single provision in the Policies implicates whether KCL was obligated to update COI rates for evolving mortality experience. As previously noted, section 3 is the only place in the Policies addressing the calculation of monthly COI rates:

> The cost of insurance rate on each monthly anniversary day is based on the insured's sex, age and risk class. Age means the age on the insured's last birthday. The guaranteed maximum monthly cost of insurance rates per $1,000 shown in the table below are based on the Commissioners 1958 Standard Ordinary Mortality Table, age last birthday.
>
> ***Monthly cost of insurance rates actually used will be determined by [KCL] based on [KCL's] expectations as to future mortality experience, but these rates will never be greater than those shown below***.

(Emphasis added.)

In Karr's motion for partial summary judgment, Karr argued that this provision obligated KCL to reduce monthly COI rates to reflect improved future mortality experience. The uncontroverted facts established that KCL determined COI rates at the time it sold each of the Policies and either never updated those COI rates or for some of the Policies updated them once or twice but never after 1996, and that KCL's expectations as to future mortality experience were at least lower in 2000 and 2005 than they had previously been. In response to the motion for partial summary judgment, KCL argued that the Policies do not require it to use its current expectations as to future mortality experience in calculating monthly COI rates and instead that in setting monthly COI rates KCL was only obligated to consider its expectations about future mortality experience at the time each of the Policies was issued.

31

The trial court found in its February 22, 2022 Order that the phrase "will be determined" unambiguously promises that monthly COI rates "will" be determined on an ongoing basis throughout the life of the Policies based on KCL's then current expectations about future mortality experience. The trial court thus found that where KCL's expectations as to future mortality experience materially improved, monthly COI rates should have been adjusted to reflect the improvement as otherwise monthly COI rates could not be said to be "based on" KCL's expectations as to future mortality experience. The trial court found that because KCL admitted that its expectations as to future mortality experience were at least lower in 2000 and 2005 than they had previously been, KCL was in breach of the Policies since at least 2000 because it admitted it did not determine monthly COI rates based on its then-current expectations as to future mortality experience.

On appeal, KCL does not challenge the trial court's conclusion that the COI rates provision in Section 3 of the Policies is unambiguous.[18] Instead, KCL argues in its third point on appeal that the trial court committed legal error by reaching an erroneous conclusion about the meaning of this unambiguous provision in the Policies.[19] KCL argues that the trial court imposed a duty stated nowhere in the Polices by construing the plain language of the COI rates provision to mean that KCL must revise or update its

---

[18]On appeal, KCL has abandoned the argument that the COI rates provision is ambiguous, and that extrinsic evidence would require resolution of the ambiguity in KCL's favor. KCL has thus not challenged the trial court's conclusion that ambiguities in the Policies, even if they existed, would be construed against KCL.

[19]*Shelter Mut. Ins. Co.*, 203 S.W.3d at 794 (holding that an insurance policy is not rendered ambiguous because the parties disagree about its correct interpretation).

expectations about future mortality experience when it calculates a monthly COI rate for the Policies. Specifically, KCL argues that the commonly understood meaning of the word "will" does not mean "shall" and that in any event the phrase "will be determined by us" suggests nothing more to the ordinary purchaser of insurance than that the monthly COI rate will be determined based on KCL's expectations about future mortality experience at the time a policy is sold.

Once again, we resolve this issue through the required lens of an ordinary purchaser of insurance. *Sachtleben*, 687 S.W.3d at 629-30 (quoting *Seaton*, 574 S.W.3d at 247). The phrase "will be determined . . . based on [KCL's] expectations as to future mortality experience" standing alone could be read to mean that the monthly COI rate will be determined based on expectations as to future mortality experience possessed at the time a policy is sold, or based on evolving expectations possessed throughout the time a policy remains in effect. Any question about which construction is proper, however, is resolved when the phrase "will be determined" is read in conjunction with the phrase "but these rates will never be greater than those shown below." The expression of a guaranteed maximum monthly COI rate would not be necessary if the monthly COI rate was not subject to alteration based on KCL's evolving expectations as to future mortality experience. An ordinary purchaser of insurance would read the COI rates provision in the Policies in its totality to mean that the COI rate will be subject to periodic recalculation based on the noted mortality factors and KCL's evolving expectations as to future mortality experience. To conclude otherwise would render meaningless the phrase "but these rates will never be greater than those shown below."

33

The trial court did not error in entering partial summary judgment in favor of Karr on the issue of liability for the breach of contract claim asserted as Count III in the amended petition. The plain meaning of the unambiguous provisions of the Policies would lead an ordinary purchaser of insurance to conclude that monthly COI rates will be determined based on KCL's evolving expectations as to future mortality experience and that COI rates might increase or decrease as future mortality experience worsens or improves though monthly COI rates would never exceed the guaranteed maximum COI rates shown on the table in Section 3 of the Policies.

Point Three is denied.

## B.

***The trial court did nor error in denying KCL's motion for summary judgment and in granting Karr's motion for partial summary judgment on the affirmative defense of the statute of limitations because KCL's breaches of the Policies were not capable of ascertainment as to commence the running of the statute of limitations (Point Four)***

### Standard of Review

The standard of review applicable to our resolution of KCL's fourth point on appeal is the same as for KCL's first three points on appeal. "Summary judgment is proper if the moving party establishes there is no genuine issue as to the material facts and the movant is entitled to judgment as a matter of law." *Sachtleben*, 687 S.W.3d at 629 (citing *Green*, 606 S.W.3d at 115). "Normally, the running of the statute of limitations is a question of law for the court to decide." *Allen v. Kuehnle*, 92 S.W.3d 135, 139 (Mo. App. E.D. 2002) (citing *Lomax v. Sewell*, 1 S.W.3d 548, 552 (Mo. App. W.D. 1999)). "However, when contradictory or differing conclusions can be drawn from the

34

evidence as to whether the statute has run, it is a question of fact for the jury to decide."
*Id.* (citing *Lomax*, 1 S.W.3d at 552-53).

## Analysis of Point Four

In its fourth point on appeal, KCL alleges that the trial court erred in denying its motion for summary judgment and in granting Karr's motion for summary judgment on the issue of the affirmative defense of the statute of limitations because many Class member's claims are "time-barred by virtue of having been capable of ascertainment outside the limitations period, in that a reasonably diligent person could have identified the potential claims from annual reports provided for decades before suit." [KCL brief, p. 55].

KCL and Karr asserted mirror image claims on the issue of the affirmative defense of the statute of limitations in their respective motions for summary judgment. As a result, KCL is permitted to challenge both the denial of its motion for summary judgment and the grant of summary judgment in favor of Karr, on this issue. *Stacy*, 522 S.W.3d at 918 (holding that the denial of a motion for summary judgment can be considered on appeal when the merits of a denied summary judgment motion are "completely intertwined with a grant of summary judgment in favor of the opposing party") (quotation omitted).

The parties agreed in their respective motions for summary judgment that the statute of limitations applicable to Karr's breach of contract claims is the five-year statute

of limitations set forth in section 516.120(1)[20] addressing "[a]ll actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110."[21] KCL argued in its motion for summary judgment that Karr was on notice of his breach of contract claims as early as 1990 and no later than 2006 because he received an annual report each year detailing the credits to and deductions from his cash value for the preceding policy year and had concerns (particularly in 2006) about rising cost of insurance deductions from his cash value. KCL contended in its motion for summary judgment that its annual reports would have put a reasonably prudent person on notice of a potentially actionable injury.

Karr contended in response to KCL's motion for summary judgment, and in affirmatively seeking summary judgment on the issue of the statute of limitations in his motion for partial summary judgment, that for purposes of determining when an applicable statute of limitations begins to run a:

---

[20]All statutory references are to RSMo 2016 as supplemented through October 1, 2019, unless otherwise indicated.

[21]Because the parties agreed that the five-year statute of limitations applied to Karr's breach of contract claims, we do not address whether the Policies constitute writings for the payment of money as to which the ten-year statute of limitations set forth in section 516.110(1) would apply. *See, e.g., Cmty. Title Co. v. Stewart Title Guar. Co.*, 977 S.W.2d 501, 502 (Mo. banc 1998) (holding that title insurance underwriting agreement that promised to pay a percentage of cash received from agents was a writing for the payment of money and that "once it is shown that the writing is for the payment of money and that the writing contains a promise to pay money, the exact amount to be paid or other detail of the obligation may be shown by extrinsic evidence—but not the promise itself"). However, whether the five- or ten-year statute of limitations applied to the breach of contract claims in this case is ultimately of no import as KCL contended in its motion for summary judgment that Karr's claims accrued (and that the statute of limitations began to run) as early as 1990 and no later than 2006, more than ten years before Karr's suit was filed.

cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained.

Section 516.100. Karr argued that the uncontroverted facts established that a reasonably prudent person would not have ascertained from the Policies or the annual reports that KCL was calculating COI rates using non-mortality factors including expense recovery and profit generation.

The trial court's February 22, 2022 Order rejected KCL's contention that Karr was on notice of his breach of contract claims because of the annual reports KCL provided. The trial court found that the "unrebutted evidence" demonstrates that KCL "never provides either its current monthly COI rates or its expectations as to future mortality experience to policyholders, including in its Annual Reports." The trial court thus found that a reasonably prudent policyholder would not be on notice of a potentially actionable injury as a matter of law. "Because the capable[-]of[-]ascertainment standard is an objective one, where relevant facts are uncontested, the statute of limitations issue can be decided by the court as a matter of law." *Powel v. Chaminade Coll. Preparatory, Inc.*, 197 S.W.3d 576, 585 (Mo. banc 2006). The trial court concluded from the uncontroverted facts that Karr's breach of contract claims were not barred by the affirmative defense of the statute of limitations.

On appeal, KCL does not argue that genuine issues of material fact were in dispute preventing the trial court from concluding, as a matter of law, that the statute of

limitations had not run on Karr's breach of contract claims. And KCL does not contest the trial court's finding that "unrebutted evidence" establishes that KCL's annual reports do not disclose monthly COI rates or KCL's expectations as to future mortality expectations. Instead, KCL repeats the argument advanced in its motion for summary judgment and contends that because the annual reports show "the inputs and outputs to cash value, the cash value over time, and particularly the [cost of insurance] deductions" that information was sufficient to document injury. [KCL's brief, p. 59]. KCL argues that "[a]ny policyholder could have known his COI rate, and seen changes in his COI rate over time, from his annual reports" obligating the policyholders to inquire further. We disagree.

Though the annual reports disclose the cost of insurance, the reports do not disclose how the cost of insurance is determined and in particular do not disclose the COI rate (a factor used in calculating the cost of insurance) or how the COI rate is determined. Policyholders would not know their COI rate, whether it has changed over time, or what is considered in determining their COI rate, from KCL's annual reports.

Moreover, though KCL's annual reports reflected an increase over time in the cost of insurance, that would not cause a reasonably prudent policyholder to be on notice of actionable injury. We agree with the trial court that mortality factors could be expected to negatively impact the calculation of monthly COI rates over the life of the Policies such that rising cost of insurance deductions would be explained by contractually authorized COI rate calculations. Karr's breach of contract claims center on KCL's use of non-mortality factors like expense recovery and profit generation to determine COI rates

38

in violation of the plain language of the Policies. The increase in cost of insuarance amounts over time would not cause a reasonably prudent policyholder to be on notice that COI rates were being determined based in part on expense recovery and profit generation.

KCL argues in its brief that the cost of insurance deduction "result[s] from a simple mathematical calculation, recited in each policy, based on the death benefit and cash value," [KCL's brief, p. 60], referring to the formula for calculating the cost of insurance set forth in section 10.6 of the Policies. But that formula, $Q \times (R - S)$, is silent about what is considered in calculating "Q" (the COI rate) beyond noting that the COI rate is "as described in Section 3." Ironically, KCL argues elsewhere in its brief that the "based on" language in Section 3 of the Policies "does not specify any method or formula for COI rates," does not "limit KCL to determining rates based *exclusively* on its 'expectations as to future mortality experience,'" does not "define (or restrict) what factors influence those expectations," and instead "preserves KCL's discretion to set rates using its complex, holistic actuarial process." [KCL brief, p. 29]. It is disingenuous for KCL to argue that the Policies recite a "simple mathematical calculation" for determining the cost of insurance deduction when it admits elsewhere in its brief that the Policies do not specify any method or formula for calculating the COI rates essential to determining the cost of insurance.

Based on the uncontroverted factual record, the trial court did not commit error when it concluded as a matter of law that Karr and other Class members could not reasonably have been expected to know or ascertain from KCL's annual reports that KCL considered non-mortality factors like profit generation and expense recovery in the

39

calculation of COI rates and failed to adjust COI rates when expectations as to future mortality experience improved. As such, Karr and other Class members could not reasonably have been expected to know or ascertain from KCL's annual reports that KCL was in breach of the Policies. *Powel*, 197 S.W.3d at 582 (holding that "the statute of limitations begins to run when the 'evidence was such to place a reasonably prudent person on notice of a potentially actionable injury'") (quoting *Bus. Men's Assurance Co. of Am. v. Graham*, 984 S.W.2d 501, 507 (Mo. banc 1999)). "In order for the statute [of limitations] to accrue, plaintiff must have knowledge of the wrong and at least nominal damage, or [knowledge] of something that puts plaintiff on notice to inquire further." *Gaydos v. Imhoff*, 245 S.W.3d 303, 307 (Mo. App. W.D. 2008) (citation omitted).

Point Four is denied.

## C.

***The trial court did nor error in granting Karr's motion for partial summary judgment because the doctrine of primary jurisdiction did not require a stay pending referral of policy interpretation issues to the Department of Insurance (Point Five)***

### Standard of Review

The standard of review applicable to our resolution of KCL's fifth point on appeal is the same as is set forth above in connection with our review of KCL's first four points on appeal. "Summary judgment is proper if the moving party establishes there is no genuine issue as to the material facts and the movant is entitled to judgment as a matter of law." *Sachtleben*, 687 S.W.3d at 629 (citing *Green*, 606 S.W.3d at 115).

40

## Analysis of Point Five

In its fifth point on appeal, KCL argues that it was error to grant partial summary judgment in favor of Karr on the issue of liability on Karr's breach of contract claims because the doctrine of primary jurisdiction required a stay of Karr's civil action pending a referral of questions to the DOI regarding alleged violations of insurance laws. KCL argues that because the DOI enforces Missouri's insurance laws, and would have approved the Policies before they could be issued, the DOI's expertise and authority "should be brought to bear" to determine whether the unambiguous provisions in the Policies permitted KCL to determine COI rates based in part on consideration of non-mortality factors such as profit generation and expense recovery.

In KCL's response to Karr's motion for partial summary judgment, KCL argued that because Karr's civil action asks the trial court to interpret the COI rates provision in the Policies, "any interpretation and potential declaratory ruling related to the terms of insurance policies and how the cost of insurance rates should be set on a going forward basis is something more properly determined by [the DOI]." KCL's response to Karr's motion for partial summary judgment asked the trial court to stay disposition of Karr's civil suit and to certify two questions to the DOI: (i) whether the "based on" language in Section 3 of the Policies referring to determination of the cost of insurance rate requires KCL to set the COI rate based solely on mortality factors, and (ii) whether KCL was contractually required to update its cost of insurance rate tables to reflect updates on mortality assumptions. KCL argued that the trial court is empowered to make these referrals under the doctrine of primary jurisdiction and should do so in this case.

41

In its February 22, 2022 Order, the trial court rejected KCL's invitation to stay Karr's civil action pending referral of questions to the DOI for resolution. The trial court found that the primary jurisdiction doctrine has been invoked almost exclusively in the Workers' Compensation Law arena where "exclusivity of remedy" before an administrative agency is mandated by statute. *See* section 287.120.2. The trial court observed that the Missouri Insurance Code[22] includes no such exclusivity provision nor even an administrative remedy for policyholders who claim an insurance company has breached its contractual obligations. As such, the trial court concluded that the primary jurisdiction doctrine is inapplicable.

We agree. Karr sought relief from KCL for breach of contract. Pursuant to the Article V, section 14(a) of the Missouri Constitution "[t]he circuit courts shall have original jurisdiction over all cases and matters, civil and criminal." The trial court was constitutionally authorized to entertain and determine Karr's civil action untethered by nonexistent statutory exclusivity vested in the DOI. Missouri statutes have not established the DOI as a tribunal for resolution of breach of contract claims involving insurance policies. *See, e.g., State ex rel. Neese v. IGF Ins. Co.*, 706 S.W.2d 856, 858 (Mo. banc 1986) (holding that statutes authorizing the Department of Agriculture to license and inspect warehouses "do not establish the [agency] as a tribunal for the determination of claims"). Instead, "[s]tatutory and contractual rights are to be adjudicated by courts, not by bureaucrats." *Id.*; *see also, e.g.*, *Loper Bright Enterprises v.*

---

[22]Chapters 374 and 375 RSMo.

42

*Raimondo*, 144 S.Ct. 2244 (2024) (holding that the constitutional authority assigned to the federal judiciary, including the power to adjudicate cases and controversies, prohibit courts from deferring to agency interpretations of the law).

KCL cites no authority supporting its contention that the trial court was empowered, let alone obligated, to certify policy interpretation questions to the DOI while staying Karr's civil suit awaiting DOI's responses. We are aware of no such authority. For that reason alone KCL's point on appeal must be denied. *Landwehr v. Hager*, 612 S.W.3d 220, 224-25 (Mo. App. E.D. 2020) (citation omitted) (holding that the "[f]ailure to cite relevant authority supporting [a] point on appeal, or to explain the failure to do so, preserves nothing for review").

Point Five is denied.

## D.

### *The trial court correctly denied KCL's motion for judgment notwithstanding the verdict because Karr presented sufficient evidence of damages at trial (Point Six)*

### Standard of Review

"The standard of review of the denial of a JNOV is essentially the same as the overruling of a motion for directed verdict." *Darks v. Jackson Cnty.*, 601 S.W.3d 247, 254 (Mo. App. W.D. 2020) (quoting *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 14 (Mo. banc 2012)). "A case may not be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence." *Id.* (quoting *Moore v. Ford Motor Co.*, 332 S.W.3d 749, 756 (Mo. banc 2011)).

> Whether a plaintiff has made a submissible case is a question of law subject to *de novo* review . . . but 'the evidence is viewed in the light most

43

favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with that verdict.'

*Id.* (quoting *Clevenger v. Oliver Ins. Agency, Inc.*, 237 S.W.3d 588, 590 (Mo. banc 2007)).  "Indeed, 'the jury's verdict will be reversed only if there is a complete absence of probative facts to support the jury's conclusion.'"  *Id.* (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. banc 2010)).

### Analysis of Point Six

In its sixth point on appeal, KCL argues that the trial court erred by denying KCL's JNOV because Karr presented insufficient evidence of damages.  Specifically, KCL argues that Karr had to show the difference between actual COI rates used by KCL and contractually compliant COI rates but never presented evidence of the latter.  KCL argues that to make a submissible case for damages Karr had to show "with reasonable certainty what position [C]lass members would have been in had KCL set COI rates consistent with the [trial] court's contract interpretation" and "that can be determined only by identifying the deductions [C]lass members should have incurred under the [trial] court's interpretation" and then "subtract[ing] that from the amounts actually deducted."  [KCL's brief, pp. 68-69].

The trial court denied KCL's JNOV on August 24, 2023, and noted in its order that Karr made a submissible case on damages for his breach of contract claims.  We will only reverse this determination if there is a complete absence of probative facts to support the jury's conclusion that the Class suffered damages for breach of contract.

44

The amount of damages awarded by the jury, $28,362,830.96, is precisely the amount opined by Karr's expert witness, S.W., an actuary retained to determine whether KCL used any non-disclosed non-mortality factors in the development of COI rates, whether the Class suffered damages as a result, and if so, to quantify those damages. Because the trial court determined liability on the breach of contract claims in its February 22, 2022 Order, S.W. confirmed at trial that he would only be testifying on the issue of damages.

S.W. explained that he quantified damages suffered by Karr and by the rest of the Class in terms of "lost cash value." S.W. testified that in performing the work for which he was retained he relied on his many years of actuarial experience and on information provided by KCL in response to discovery:

> specifically with respect to [COI] rates, expected mortality and interest rates that [KCL] used historically . . . . policyholder data . . . . monthly historical information that showed how the cash value in its various components played out historically . . . . testimony from [KCL] employees, actuaries, [] designated corporate representative with respect to how they develop the price of mortality and how the original cost of insurance rates were developed . . . . and the [trial] Court's order interpreting the language of the policies . . . .

S.W. identified Exhibit 52 as a spreadsheet provided by KCL that shows the COI rates for each of the insurance products included in the Class definition. S.W. testified that the first part of his damage analysis was to take the COI rates KCL actually used and then to compare them to KCL's mortality rate referring to the mortality assumptions provided by KCL in discovery. S.W. identified Exhibit 55 as a spreadsheet provided by KCL that shows the mortality assumptions for each of the KCL products included in the

45

Class adjusted over time.  S.W. explained that the spreadsheet broke down mortality assumptions by sex, age at the time of policy issuance, policy year, and different rate classes for smokers and non-smokers.  S.W. explained that to get the individual mortality assumption for a given sex, age, rate class, and policy year, he simply multiplied the percentage shown in the appropriate column times the mortality table shown on the spreadsheet.  That allowed him to get a complete mortality table for every possible age, sex, rate class, and policy at that particular point in time.

S.W. then used these calculations to look for situations where the COI rate used by KCL was greater than the mortality rate that he calculated from the mortality assumptions KCL provided.  S.W. testified that he made this comparison for every single Policy for every single month to identify instances where the COI rate used was higher than the mortality rate.  Stated another way, S.W. located situations for every Policy in every policy month where KCL's COI rate was greater than the mortality rate calculated from KCL's mortality assumptions.

S.W. then identified Exhibit 54 which was information supplied by KCL that shows for each insurance product how interest rates were credited historically on the Policies.  He relied on that information to calculate the interest that would have been paid on the differences between COI rates actually used by KCL and the lesser mortality assumptions shown by KCL that should have been used as the COI rate since that difference would have otherwise remained a part of the interest-bearing cash value for each Policy.

46

Then, S.W. testified about Exhibit 212 which he characterized as the final tabulation of his damage calculations. S.W. explained that the "white columns" on Exhibit 212 represent the information supplied by KCL including a column that shows the net amount of risk (R - S in the formula identified in the Policies for calculating the cost of insurance). S.W. explained that he calculated damages for each Policy through February 2021 (the last date for which policy data was provided by KCL) if the Policy remained in force as of that time and otherwise through the date of termination or surrender of each Policy.

S.W. used Exhibit 212 and Exhibit 212A to opine to a reasonable degree of mathematical certainty that Karr's individual damages were $2,092.72. He then testified that Exhibits 203, 204, and 205 provided the end result of similar calculations for every member of the Class. Finally, S.W. testified that Exhibit 206 pulls the penultimate data from each of the prior referenced exhibits to demonstrate how he arrived at the aggregate damage calculation for the Class in the amount of $28,362,830.96 which he characterized as "a straight arithmetic sum." S.W. then explained the conservative nature of his calculations in several particulars before confirming that to a reasonable degree of mathematical certainty Class damages were at least $28,362,830.96.

S.W. testified that his damage calculation was the same for KCL's breach of the cost of insurance provisions and the expense charge provisions (Counts I and II of the amended petition). S.W. later testified on cross-examination that his damage calculation also applied to KCL's breach in failing to use current expectations about future mortality

47

experience in calculating COI rates (Count III of the amended petition) because the impact of that breach is subsumed in the damages calculated for Count I.

S.W.'s testimony plainly reflects a comparison between the COI rates actually used by KCL and KCL's mortality assumptions for the same periods—the only data that should have been relied on by KCL to determine COI rates based on the plain language of the Policies. S.W.'s testimony was more than sufficient to submit the issue of damages to the jury.

KCL's argument to the contrary relies on S.W.'s cross-examination testimony where S.W. testified that he did not calculate the "COI rate" that KCL should have used because that was not the exercise for which he was retained. [KCL's brief, p. 69]. However, S.W. made clear during cross-examination that he had been retained to calculate a damage model and did so for each month as to every one of the Policies in the Class by identifying each month where there was a breach of the Policies because KCL charged more than it was permitted and by calculating the amount of the overcharge for each month. KCL's hyper-technical focus on the phrase "COI rate" ignores that the mortality assumptions S.W. used in his damage model were, in effect, the "COI rate" that S.W. opined KCL should have been using to determine the cost of insurance given the trial court's construction of the plain language in the Policies. The trial court did not commit error in denying KCL's JNOV as there is not a complete absence of probative facts on the issue of damages.

KCL raises additional complaints about S.W.'s damage calculation in the argument portion of its brief. For example, KCL notes that S.W. acknowledged on cross-

48

examination that in some months as to some of the Policies he determined that KCL used a lower COI rate than its mortality assumptions would have permitted. S.W. acknowledged that in those months his damage calculation spreadsheets show a "zero" for the amount of damages incurred by the policyholder and do not afford KCL a credit against the total damage calculation for the "undercharged" COI rate. But, this testimony does not render S.W.'s testimony insufficient to submit the issue of damages to the jury. Though the Policies set a "ceiling" for monthly COI rates, defined by plain language which limits KCL to consideration of mortality factors and to a guaranteed maximum monthly COI rate that can ever be charged, the Policies do not set a "floor," as they do not require KCL to use a COI rate that is the highest it is contractually permitted to calculate. KCL's complaint that S.W. used a "floor" for calculating Class-wide damages at best goes to the weight of the damage evidence but not to submissibility of the issue of damages to the jury.

KCL also complains in the argument portion of its brief that S.W. used "mixed and matched" elements from different mortality assumption datasets to calculate damages including "pricing assumptions," "deferred acquisition cost unlocking" figures, and "cash-flow testing" data. [KCL's brief, pp. 69-71]. These arguments also do not negate the submissibility of the issue of damages and instead go to the weight of the evidence.[23]

---

[23]KCL's arguments about S.W.'s use of a "floor" and his use of mixed mortality assumptions exceed the scope of KCL's point relied on which is expressly limited to the contention that because S.W. did not expressly calculate the COI rate that should have been charged by KCL, Karr did not make a submissible case on the issue of damages. The arguments are thus not preserved for our review. *KDW Staffing, LLC v. Grove Constr.*, 584 S.W.3d 833, 837 n.4 (Mo. App. W.D. 2019) (holding that arguments that

49

The trial court did not error in denying KCL's JNOV because Karr made a submissible case on the issue of damages.

Point Six is denied.

## E.

### *The trial court did not error by certifying the Class or by denying KCL's motions to decertify the Class because common issues predominated over individualized issues (Point Seven)*

### Standard of Review

"Whether a claim should proceed as a class action 'rests with the sound discretion of the trial court.'" *Hootselle v. Mo. Dep't of Corr.*, 624 S.W.3d 123, 133 (Mo. banc 2021) (quoting *State ex rel. Gen. Credit Acceptance Co., LLC v. Vincent*, 570 S.W.3d 42, 46 (Mo. banc 2019)). "A circuit court abuses its discretion if its decision 'is clearly against the logic of the circumstance, is arbitrary and unreasonable, and indicates a lack of careful consideration.'" *Id.* (quoting *State ex rel. McKeage v. Cordonnier*, 357 S.W.3d 597, 599 (Mo. banc 2012)). "It cannot be said that the circuit court abused its discretion where reasonable persons could differ with the propriety of its ruling." *Smith v. Leif Johnson Ford, Inc.*, 632 S.W.3d 798, 803 (Mo. App. E.D. 2021) (quoting *Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 164-65 (Mo. App. W.D. 2006)). "Where the record can support class certification under Rule 52.08, the circuit court has not abused its discretion." *Id.* (citation omitted).

---

exceed the scope of a point relied on preserve nothing for appellate review pursuant to Rule 84.04(d)(1). Even had the arguments been preserved for our review, they do not affect submissibility of the issue of damages to the jury as we explain.

**Analysis of Point Seven**

In its seventh point on appeal, KCL argues that the trial court committed error both in its initial certification of the Class and in its denial of KCL's motions to decertify the Class. KCL contends that individualized issues regarding damages predominate over common issues thereby making this case unsuitable for class treatment.

Class certification in Missouri is governed by Rule 52.08. Under Rule 52.08(a), class certification first requires a proposed class to meet four prerequisites: numerosity, commonality, typicality, and adequacy. *Hootselle*, 624 S.W.3d at 133. If these prerequisites are met, a class can then be certified if the proposed class also satisfies one of the three requirements for continued maintenance of a class outlined in Rule 52.08(b). *Id.*; *and see* Rule 52.08(b). In this case, the trial court found that the proposed class satisfied the four prerequisites described in Rule 52.08(a) and that the proposed class could be maintained under Rule 52.08(b)(3)[24] which applies where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Rule 52.08(b)(3). The trial court thus certified the Class over KCL's objection. After the Class was certified, KCL filed

---

[24]Technically, the trial court certified the Class under both Rule 52.08(b)(2) and Rule 52.08(b)(3). However, the court's certification under Rule 52.08(b)(2) was limited to "Plaintiff's claims for declaratory and injunctive relief." As noted, *supra*, Karr's request for declaratory and injunctive relief was dismissed without prejudice after trial. Thus, class certification pursuant to Rule 52.08(b)(2) is no longer relevant.

motions requesting decertification of the Class before trial and again after trial. The motions were denied.

KCL argues that the trial court committed error both when it initially certified the class and again when it denied KCL's motions for decertification. KCL's contention on appeal is limited to challenging the trial court's finding that the Class could be maintained pursuant to Rule 52.08(b)(3). KCL contends that damages "were not—and could not be—measured on a class-wide basis." Specifically, KCL asserts that the aggregate damages model created by S.W. failed to include: "individualized details or even the distinct theories that apply to each of the three counts of contract claims," as well as considerations for policyholders who received the "full benefit of their bargain," or who were actually charged a lower COI rate in some months than the mortality assumptions used by S.W. to calculate damages. As a result, KCL insists that individual issues predominate over Class-wide issues such that the Class should never have been certified, or alternatively, once certified should have been decertified.

With respect to decertification of the Class, the record reflects that KCL filed a motion to decertify the Class prior to trial. In the record on appeal, at the location for this motion and other related pleadings, there are "placeholder" pages noting that the referenced pleadings were "filed under seal." However, the pleadings themselves have not been provided to this court for review. We are thus unable to confirm that KCL raised the same issue it now raises on appeal with the trial court in its pre-trial motion to decertify the Class. It is an appellant's obligation to provide this court with a record on appeal sufficient to conduct meaningful appellate review which includes confirming that

a claim of error has been properly preserved for review. *Olsen v. Liberty Grp. Mo. Holdings, Inc.*, 250 S.W.3d 720, 721 (Mo. App. W.D. 2008) (holding that pursuant to Rule 81.12(a), an appellant bears the burden of providing a sufficient record to permit appellate court to engage in meaningful appellate review); *Daniels v. Bd. of Curators of Lincoln Univ.*, 51 S.W.3d 1, 6 (Mo. App. W.D. 2001) (holding that it is the appellant's obligation to provide an appellate court with a sufficient record to demonstrate preservation of a claim of error raised on appeal). KCL has not sustained this burden with respect to the denial of its pre-trial motion to decertify the Class and that claim of trial court error is denied.

KCL also filed a motion to decertify the Class after the jury returned its verdicts and, thus, ***after*** a decision had been reached on the merits. "Missouri courts consistently recognize a certified class may subsequently be modified or decertified later ***before a decision on the merits***." *Damon v. City of Kansas City*, 419 S.W.3d 162, 169 n.3 (Mo. App. W.D. 2013) (emphasis added) (quoting *Ogg v. Mediacom, LLC*, 382 S.W.3d 108, 116 (Mo. App. W.D. 2012)); *and see* Rule 52.08(c)(1) ("An order under this Rule 52.08(c)(1) may be conditional and may be altered or amended before the decision on the merits"); *Hale v. Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 228-29 (Mo. App. W.D. 2007) (finding that a trial court can decertify or modify certification "before the decision on the merits"); *and e.g.*, *Elsea v. U.S. Engineering Co.*, 463 S.W.3d 409, 416 (Mo. App. W.D. 2015) ("Inasmuch as Rule 52.08(c)(1) provides for de-certification of a class ***before a decision on the merits***, we will err on the side of upholding certification in cases where it

53

is a close question") (emphasis added) (citation omitted). KCL's claim of trial court error based on the denial of its post-trial motion to decertify the Class is denied.

We are left with KCL's claim of trial court error in the initial certification of the Class.[25] "The common-question-predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Smith*, 632 S.W.3d at 808 (quoting *Dale*, 204 S.W.3d at 175). While the common-question-predominance requirement is more demanding than the commonality prerequisite of Rule 52.08(a)(2), "[t]he fundamental question is whether the group aspiring to class status is seeking to remedy a common legal grievance, and the answer is based on the nature of the evidence that will suffice to resolve the legal question." *Id.* (citation omitted). "[N]ot every single issue must be common to all class members. In fact, the predominance requirement can be satisfied if there is one single common issue that is the overriding issue in the litigation. This single predominant issue need not even be dispositive of the case." *Elsea*, 463 S.W.3d at 422 (Mo. App. W.D. 2015) (quoting *Smith v. Am. Fam. Mut. Ins. Co.*, 289 S.W.3d 675, 688 (Mo. App. W.D. 2009)).

> If, to make a prima facie showing ***on a given question***, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.

---

[25]Our analysis regarding the trial court's initial certification of the Class would also apply to the trial court's denial of KCL's motions to decertify the Class though we have not addressed KCL's motions to decertify on their merits for the reasons explained.

*Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 175 (Mo. App. W.D. 2006) (emphasis in original) (citation omitted). "Common questions of law or fact may be overriding, 'despite the fact that the suit also entails numerous individual questions.'" *Hootselle*, 624 S.W.3d at 134 (quoting *State ex rel. Am. Fam. Mut. Ins. Co. v. Clark*, 106 S.W.3d 483, 488 (Mo. banc 2003)). "The need for inquiry as to individual damages, however, 'does not preclude a finding of predominance.'" *Id.* (quoting *Clark*, 106 S.W.3d at 488).

Here, the trial court found that although the amount of damages for each Class member may vary, the means or method by which damages should be calculated for each Class member is essentially the same. In addition, the trial court found that "the same alleged misconduct of [KCL] that gives rise to the causes of action asserted by [Karr] are the same acts that give rise to all Class Members' rights of redress."

KCL does not challenge the trial court's finding that the issue of breach of contract liability was a common question for all Class members. In fact, the record reflects that Karr's motion for partial summary judgment on the issue of breach of contract liability relied on the same evidence and argument to establish liability for all Class members. On this unchallenged basis alone the predominance test is satisfied. *See Smith*, 632 S.W.3d at 808 (finding that the predominance test is satisfied if the group aspiring to class status is seeking to remedy a common legal grievance, and that whether a legal grievance is a common one is dependent on the nature of the evidence that will suffice to resolve the question); *Elsea*, 463 S.W.3d at 422 ("The predominant issue need not be dispositive of the controversy or even be determinative of the liability issues involved"). Thus, even accepting KCL's argument that there are individualized issues related to damages, that

alone would not prevent the Class from meeting the predominance requirement. *See*

*Hootselle*, 624 S.W.3d at 134 (finding that the need for inquiry as to individual damages

does not preclude a finding of predominance).

Moreover, we are persuaded that the trial court correctly held that even though

each Class member's damages are individualized, the means or method by which

damages should be calculated for each Class member is essentially the same. The

propriety of that finding was aptly demonstrated by S.W.'s trial testimony which

explained how the same damage model was employed for each Class member to

determine Class-wide damages. S.W. compared the COI rate actually used by KCL in

each month for each Class member against the mortality assumption data supplied by

KCL for those same months to determine whether the COI rate was overstated. S.W.

then calculated the contract interest that would have been earned on the overstated cost of

insurance amounts improperly subtracted from cash value. S.W. then cumulated his

individual Class member calculations to arrive at a Class-wide damage number. It is

immaterial to the predominance discussion that each Class member's contribution to the

Class-wide damage number will be individualized. What matters is that the same means

or measure of calculating damage was used for each Class member.

Because the record supports class certification under Rule 52.08, the trial court did

not abuse its discretion in certifying the Class or in refusing to decertify the Class. *Smith,*

632 S.W.3d at 803.

Point Seven is denied.

**F.**

***The trial court did not error by denying KCL's motion for new trial because the trial court did not abuse its discretion by precluding KCL's expert from testifying about an alternative damage calculation that depended on evidence excluded by the trial court and about which KCL raises no challenge on appeal (Point Eight)***

**Standard of Review**

"A trial court's denial of a motion for new trial is reviewed under an abuse of discretion standard." *Bair v. Faust*, 408 S.W.3d 98, 102 (Mo. banc 2013) (citation omitted). "Additionally, the court has broad latitude in determining whether to admit or exclude testimony, and absent an abuse of discretion, its decision will not be disturbed." *Id.* (citation omitted). "An abuse of discretion occurs when a ruling is clearly against the logic of the circumstances before the court and is so arbitrary and unreasonable that the ruling indicates a lack of careful deliberate consideration and shocks the sense of justice." *Id.* (citation omitted).

To preserve a claim of error related to the exclusion of evidence, "the proponent of that evidence is required to make an offer of proof." *Menschik v. Heartland Reg'l Med. Ctr.*, 531 S.W.3d 551, 562 (Mo. App. W.D. 2017) (quotations omitted). "The purpose of making such an offer is 'to inform the trial court about the content of the proffered evidence and to allow an appellate court to assess the prejudicial effect of the exclusion.'" *Id.* (quoting *Giles v. Riverside Transp., Inc.*, 266 S.W.3d 290, 299 (Mo. App. W.D. 2008)). "To that end, the offer of proof must lay out: '(1) what the proffered evidence would be; (2) its object and purpose; and (3) all the facts necessary to establish its relevance and admissibility.'" *Id.* (quoting *Key v. Diamond Int'l Trucks*, 453 S.W.3d 352, 362 (Mo. App. W.D. 2015)). "It is the burden of those seeking to introduce the evidence

to make the offer of proof." *Id.* (citing *Giles*, 266 S.W.3d at 299). "Should the party seeking to introduce the evidence fail to make the offer of proof, then nothing is preserved for review and the claim of error must be dismissed." *Id.* (citing *Reed v. Kansas City Missouri Sch. Dist.*, 504 S.W.3d 235, 243 (Mo. App. W.D. 2016)).

**Analysis of Point Eight**

In its eighth point on appeal, KCL argues that the trial court erred by denying its motion for new trial because the testimony of KCL's expert witness, M.M., "was erroneously excluded, in that the [trial] court was sanctioning discovery conduct that was permitted and proper." [KCL brief, p. 76]. KCL argues that the trial court excluded testimony from M.M. about "a much lower alternative damages figure." [KCL brief, p. 76]. KCL argues in its brief that M.M.'s excluded testimony "would have provided numbers showing policyholders often benefitted from KCL's [COI] rates compared to the [trial] court's contract interpretation, with the result that overall damages were much lower than [S.W.] estimated by ignoring those benefits." [KCL brief p. 77]. KCL's brief claims that the trial court excluded this testimony as an improper discovery sanction because although M.M.'s opinion about an alternative damage calculation had not been disclosed to Karr prior to trial, KCL had no obligation to do so as M.M. was a non-retained expert.

KCL's point on appeal is without merit. M.M.'s alternative damage calculation was based on applying a margin of error to mortality assumptions to calculate monthly COI rates. Margin evidence had already been excluded from evidence by the trial court as inadmissible because permitting consideration of a "margin of error" in determining

58

the mortality assumptions used to calculate monthly COI rates would be inconsistent with the trial court's determination that the plain language of the Policies required COI rates to be calculated based on mortality factors and nothing more.

KCL has not challenged the trial court's exclusion of "margin of error evidence" on appeal. Because M.M.'s alternative damage calculation was based on inadmissible evidence, the alternative damage calculation was not admissible rendering irrelevant and immaterial whether M.M.'s alternative damage calculation testimony was also properly excluded by the trial court because it had not been disclosed to Karr prior to trial.

An explanation of the events at trial leading up to M.M's excluded testimony is essential to understanding our conclusion. During its case-in-chief, KCL called T.P., an actuary, as a retained expert witness. T.P.'s direct examination testimony focused on criticizing the methodology S.W. used to calculate damages in several respects. T.P. was asked to explain how mortality assumptions can vary depending on what the assumptions are being used for. T.P. explained, for example, that mortality assumptions used to create an amortization schedule for an insurance company are different from mortality assumptions used for pricing or repricing an insurance product. T.P. testified that although it would be easy to think that a mortality assumption is the same regardless the purpose for its use, in fact, "in the insurance business there are many different mortality assumptions that are used for many different purposes." T.P. testified that in pricing products insurance companies are typically going to use mortality assumptions that have more margin built into them. Through T.P.'s testimony KCL thus criticized the mortality assumptions that S.W. relied on to calculate Class-wide damages which KCL argued

59

were not based on product pricing assumptions but instead were mortality assumptions generated by KCL for other purposes like cash flow testing or amortization. The import of T.P.'s testimony was intended to support the argument that S.W.'s damage calculation was inflated because S.W. calculated the difference between monthly COI rates KCL actually used and mortality rates KCL should have used in reliance on mortality assumptions that were too low.

T.P. was then asked to explain what he meant about using margins for mortality assumptions when pricing or repricing a universal life policy. T.P. testified that in pricing a universal life policy a company is establishing assumptions for the future and "when you talk about something as unpredictable as mortality, companies are projecting out a mortality expectation 20, 50, 100 years into the future . . . . [s]o it is generally proven for companies to assume some margin in that assumption . . . ." Karr objected that testimony about using a margin of error over and above mortality assumptions when calculating monthly COI rates was counter to the trial court's February 22, 2022 Order which found that the plain language of the Policies required COI rates to be determined based on mortality factors alone. Karr argued that evidence of a margin of error layered on top of mortality assumptions for the purpose of pricing a product, whether or not consistent with Actuarial Standards of Practice, was inadmissible because the evidence sought to redefine the determined meaning of the plain language of the Policies. The trial court sustained the objection and stated:

> So you're on the edge of getting into the liability issue on these contract claims, which have been decided as we know. They have been ruled in favor of the plaintiff. I think you are beyond this witness' testimony about

60

damage calculations. And you are getting into defending the liability of this thing. So I am going to sustain the objection.

KCL's counsel responded that testimony about margins does not question liability but instead just recognizes that the mortality assumptions could be wrong. The trial court repeated its ruling sustaining the objection.

T.P. then testified that in his opinion it was not appropriate for S.W. to use mortality assumptions from deferred acquisition cost, deferred acquisition cost unlocking, or cash flow testing in his damage model. T.P. was permitted to testify, over Karr's objection, that if mortality assumptions generated for product pricing purposes were used, Karr, individually, would have sustained no damages and in fact would have "damages" in the amount of negative $1,871.00. T.P. was not asked to give an opinion about the aggregate damage amount for the Class using only pricing assumptions to calculate mortality rates.

The trial court then entertained an offer of proof from KCL, out of the presence of the jury, related to the excluded testimony from T.P. about considering margins in calculating the mortality assumptions used to determine monthly COI rates. T.P. testified about an actuarial standard addressing assumption margins, meaning an allowance for conservatism, and stated that assumptions relating to mortality experience are expressly addressed in the standard. As a part of the offer of proof, T.P. testified that a margin recognizes that projections or assumptions might be incorrect and provides an insurer with "wiggle room." At the end of the offer of proof, the trial court advised that its ruling was the same and excluded testimony from T.P. about the propriety of considering

61

margins in determining mortality assumptions in calculating monthly COI rates pursuant to the Policies.

After T.P. testified, and at the conclusion of lengthy discussions at the bench, KCL advised the trial court that its next witness "is going to have testimony that gets into the same margin assumptions. So at the conclusion of his direct and cross, we are going to do an offer of proof outside the presence of the jury on what he would have testified on the margin testimony." KCL was referring to M.M., its next witness. M.M. is employed at KCL in the position of senior vice-president and actuary and testified that he is responsible for all of the functions of the actuarial department.

M.M.'s testimony was brief and focused on his disagreement with the methodology used by S.W. to calculate damages. M.M. testified about Exhibit 1275, a chart he created, which he said showed that Karr, individually, suffered no damages. Karr's objection to admission of the exhibit was overruled. But importantly, in discussing Karr's objection to admission of Exhibit 1275 with the trial court, KCL's counsel explained that the exhibit showed that "other than the first few years of . . . Karr's policy, his COI rate was actually significantly lower than the mortality rate." It is not clear from M.M.'s testimony whether M.M.'s chart used mortality assumptions based on pricing but it can be presumed that the chart used different mortality assumptions than those used by S.W. in his damage model.

At the conclusion of M.M.'s direct and cross-examinations, KCL made an offer of proof as it had advised it would. KCL began the offer of proof as follows:

Q;      [M.M.], do you have an opinion as to the appropriateness of [S.W.'s] use of no floor -- or use of a floor in his damages model, where in months where the cost of insurance charge was lower than the assumed mortality rate employed by [S.W.]?  He didn't account for the fact it was lower.  It says zero floor.  Do you have an opinion as to the appropriateness of doing so as a professional actuary?

A:      Yeah.  My opinion is that that is not appropriate to have a floor like [S.W.] in his calculation.

This portion of M.M.'s offer of proof testimony did not address the application of a margin of error to mortality assumptions used to calculate monthly COI rates.  Even more importantly, it did not address excluded evidence at all as S.W. was cross-examined about using a floor without objection.  It is unclear why KCL did not seek to elicit this testimony from M.M. discrediting S.W.'s damage calculation in the presence of the jury.  Regardless, this portion of M.M.'s offer of proof testimony is irrelevant to KCL's eighth point on appeal.  M.M. did not calculate (or testify about) an alternative damage number that worked from S.W.'s damage model in all respects except for affording KCL a credit against the Class-wide damage calculation in those months when the actual COI rated used by KCL was less than the mortality assumptions used in S.W.'s damage model.

M.M.'s offer of proof testimony then continued to address whether a margin should be considered in setting mortality assumptions used to calculate monthly COI rates:

Q:      Okay.  And with respect to the use of assumptions, the use of mortality assumption.  Is it appropriate as an actuary in a pricing or repricing exercise to build in a margin into the pricing model?

A:      Well, the Actuarial Standards of Practice regarding pricing of policies would say actuaries should consider having a margin when determining pricing of a product.

Q:      And the margin, is the margin a mortality factor?

A:      Well, the margin could be based on, for example, fluctuations in mortality.  But would definitely be related to mortality.  So I would say that would be a mortality factor.  Yes.

Q:      And so in your experience as a professional actuary with 40 years of experience at Kansas City Life, if you are saying the cost of insurance rate equal to mortality factors only, what would you consider to be an appropriate margin for the mortality assumption used in that determination?

A:      Well, for example, if I were looking at the original pricing assumptions, I would assume about a 10 percent margin on top of that would be an appropriate margin for the additional benefits that are not covered by the cost or by the mortality assumptions, and for fluctuations, and for risk and uncertainty.  Especially in today's world, where there is just a lot of factors affecting mortality.

Q:      *And [M.M.], have you calculated class-wide damages using such a margin in the mortality assumptions*?

A:      Yes, I have.

Q:      And what was the number that you calculated?

A:      I have calculated a damages amount of $5.6 million.

Q:      And is that $5.6 million across the entire class in this Karr case?

A:      Yes.  Every policy in the Karr case.

(Emphasis added.)  M.M. testified on cross-examination during the offer of proof that his calculation was something he had been working on over the past couple of weeks and that it had not been previously provided to Karr's counsel.

64

The offer of proof was followed by a lengthy debate about whether M.M.'s alternative damage calculation for the Class based on use of a margin over and above mortality assumptions could be admitted because the opinion had not been previously disclosed. At the end of the discussion, the trial court ruled it would not permit M.M. to testify that it was his opinion that Class-wide damages were only $5.6 million because the opinion had not been previously disclosed and was a surprise to everyone, including the trial court. To that point, the trial court noted:

> The Court: All right. Let me say this for the record too. I had no idea until the end of the offer of proof that this issue was even percolating. No one said . . . anything to me about a proposed, really an opinion to come from this witness about the very central issue in this trial. That is the calculation of damages based upon the violation of policies.
>
> . . . .
>
> ***And I thought we were dealing with this offer of proof, because how it was represented to me was it was going to be regarding the issue of margins***.
>
> . . . .
>
> In any event, this was a total surprise to me. And I think the Missouri rule about nonretained experts of parties, employees of parties in a case, obviously addresses a situation where a witness is testifying, happens to have qualifications in a certain area they work in, and they are going to give testimony about something in the case.
>
> It's an altogether different thing to have an expert, in fact, who is the head actuary at [KCL] do his own examination and calculation of what he thinks the damages ought to be based upon his method, and then to pretend like that's just some normal nonretained expert situation.

KCL contends in its point on appeal that it was error to exclude M.M.'s alternative damage calculation as a discovery sanction because the opinion of a non-retained expert

65

need not be disclosed.  But, this contention ignores that at the conclusion of M.M.'s offer of proof, KCL did not ask the trial court to revisit its ruling excluding margin evidence in determining mortality assumptions, and KCL has not challenged the exclusion of margin evidence on appeal.  Thus, even if we were to conclude that M.M.'s alternative damage calculation formulated just weeks before trial did not have to be disclosed to Karr (a subject we need not address and about which we express no opinion), we would not find that the trial court committed prejudicial error in prohibiting M.M. from testifying about the alternative damage calculation because the opinion was based on inadmissible margin evidence.  M.M. confirmed that fact during his offer of proof when he testified that he calculated Class-wide damages using a margin over and above the mortality assumptions.  And KCL's counsel confirmed that fact when he advised the trial court that he had informed Karr's counsel prior to the offer of proof that M.M. intended to testify about a damage "number" and would be doing so in the offer of proof and not in front of the jury *"[b]ecause his calculation relies on assumption margin.*"  (Emphasis added.)

Because consideration of margins in setting mortality assumptions was ruled inadmissible, M.M.'s alternative damage calculation based on margin evidence was inadmissible.  It is irrelevant whether the alternative damage calculation should also have been excluded because it was never disclosed to Karr.

Point Eight is denied.

**F.**

*The trial court did not commit plain error in denying KCL's motion for new trial which complained that Karr improperly commented about the absence of alternative damage*

66

*calculation evidence during closing argument when no objection to the closing argument was made at trial (Point Nine)*

## Standard of Review

KCL concedes that the claim of error raised in its ninth point on appeal, though raised in its motion for new trial, was not raised during trial.

> [F]ailure to object to an argument at the time counsel is addressing the jury results in a waiver of any rights to complain about the argument on appeal, . . . because the trial court must be given an opportunity to take corrective action to cure any prejudicial effect of an erroneous argument.

*Hensic v. Afshari Enters., Inc.*, 599 S.W.2d 522, 526 (Mo. App. E.D. 1980) (citations omitted). "Thus, an issue based upon an alleged erroneous closing argument is not preserved if raised for the first time in a motion for new trial." *Id.* (citation omitted).

KCL argues that because the issue it raises is a "matter of manifest injustice, it can be reviewed without regard to preservation." [KCL's brief, p. 81]. That is not entirely accurate. We are permitted (but not required) to review unpreserved claims of trial court error pursuant to Rule 84.13(c), which provides that "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Plain error occurs in the case of closing argument if the 'closing argument contains reckless assertions, unwarranted by proof and intended to arouse prejudice, which, therefore, may be found to have caused a miscarriage of justice.'" *Williams v. Jacobs*, 972 S.W.2d 334, 344 (Mo. App. W.D. 1998) (quoting *Hensic*, 599

67

S.W.2d at 526). "Rarely will comments made during closing argument rise to the level of plain error, entitling a party to relief." *Id.* (citation omitted).

**Analysis of Point Nine**

In its ninth point on appeal, KCL complains that during closing argument, Karr's counsel twice noted that KCL "had their criticisms [of S.W.'s damage calculations] but they did not present you an alternative damages model." KCL complains that this was highly prejudicial because Karr knew KCL had tried to admit an alternative damages calculation through M.M. but had been prevented from doing so by Karr.

We disagree. KCL vigorously challenged S.W.'s damage calculations throughout trial during S.W.'s cross-examination and during the direct examinations of T.P. and M.M. With the exception of inadmissible "margin" evidence, there is nothing that prevented KCL from offering its own damage calculation for the jury's consideration. In fact, it did so, on a limited basis, as both T.P. and M.M. were permitted to testify that their calculations showed that Karr, individually, suffered no damages and actually benefited from the COI rates used over the life of his policy.[26] During closing argument, KCL extrapolated from this testimony and argued that because Karr suffered no damages, the jury could conclude that, for the same reasons, the Class suffered no damages. KCL

_____

[26]In the case of T.P., this testimony came in over Karr's objection, which, though overruled, arguably should not have been. T.P. testified that the mortality assumptions he used to determine that Karr had no individual damages, and in fact had negative damages, were product pricing mortality assumptions. T.P. had already testified that product pricing mortality assumptions include a margin of error—the very "margin" evidence the trial court had already ruled was inadmissible because authorizing use of a margin over and above mortality assumptions to calculate COI rates is inconsistent with the determined meaning of the Policies' unambiguous COI rates provision.

also spent considerable time during closing argument attacking S.W.'s damage model and highlighted that S.W. used a "floor" that did not credit KCL when COI rates used were lower than mortality assumptions, and that S.W. used mortality assumptions that had been blended in a way that artificially inflated the disparity between the assumptions and the monthly COI rates used by KCL. It was plainly KCL's strategy at trial to establish that no damages had been incurred by Karr or the Class and/or that no damages had been reliably proven by S.W., a strategy that was both logical and furthered by Jury Instruction Number 1 which advised the jury that "there has been no determination whether the [C]lass was damaged by [KCL's] actions."

Karr's statement during closing argument to the effect that KCL did not offer an alternative damage calculation was an accurate comment on the evidence. Moreover, the comment did not prejudice KCL whose trial strategy appears plainly to have been devoted to securing a zero-damage verdict from the jury.

The trial court committed no error, plain or otherwise, in denying KCL's motion for new trial based on a claim of prejudicial closing argument by Karr.

Point Nine is denied.

## II.

## Karr's Cross-Appeal

Because none of KCL's points on appeal have merit, we turn our attention to the single point on appeal raised in Karr's cross-appeal which challenges the trial court's May 10, 2023 Interim Judgment denying Karr's request for an award of pre-judgment interest.

## A.

69

*The trial court's May 10. 2023 Interim Judgment erroneously denied Karr's request for an award of prejudgment interest because damages from KCL's breach of the Policies were capable of ascertainment*

### Standard of Review

"Determination of the right to prejudgment interest is reviewed *de novo* because it is primarily a question of statutory interpretation and its application to undisputed facts." *Assurance Gen. Contracting, LLC v. Ekramuddin*, 604 S.W.3d 761, 771 (Mo. App. E.D. 2020) (quoting *Children Int'l v. Ammon Painting Co.*, 215 S.W.3d 194, 202 (Mo. App. W.D. 2006)).

### Analysis of Point One of Cross-Appeal

In his sole point on appeal, Karr argues that the trial court erred when it entered the May 10, 2023 Interim Judgment denying Karr's motion for prejudgment interest. Karr argues that damages for breach of contract were readily ascertainable at the time of each breach making the damages liquidated or capable of ascertainment as a matter of law such that an award of prejudgment interest was mandatory pursuant to section 408.020.

After the jury entered its verdicts, Karr filed a motion for judgment on the jury's verdicts which sought, among other things, an award of pre-judgment interest. KCL argued in its suggestions in opposition that Karr's breach of contract claims were not liquidated and that an award of prejudgment interest would result in a double recovery because S.W. had already included prejudgment interest in his Class-wide damage calculation. The trial court's May 10, 2023 Interim Judgment denied Karr's request for

70

prejudgment interest because it found that the damages awarded by the jury were not liquidated. This was error.

"Judgments do not bear interest either as a matter of legal right or under the common law . . . [a]ny allowance of interest, therefore, must be based upon either a statute or a contract, either express or implied." *Bass v. Police Ret. Sys. of Kansas City*, 638 S.W.3d 501, 512 (Mo. App. W.D. 2021) (quoting *A.G. Edwards & Sons, Inc. v. Drew*, 978 S.W.2d 386, 396 (Mo. App. E.D. 1998)). In breach of contract actions a party may be entitled to prejudgment interest under section 408.020, which states, in pertinent part, that: "[c]reditors shall be allowed to receive interest . . . for all moneys after they become due and payable, on written contracts . . . after they become due and demand of payment is made." "Three requirements must be met before such interest can be awarded on a claim: (1) the expenses must be due; (2) the claim must be liquidated or the amount of the claim reasonably ascertainable; and (3) the obligee must make a demand on the obligor for the amount due." *Nelson v. Farm Bureau Town and Country Ins. Co. of Mo.*, 560 S.W.3d 81, 92 (Mo. App. W.D. 2018) (quoting *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 350 (Mo. App. W.D. 2009)). "If a demand for payment isn't made before the filing of the lawsuit, then the filing itself constitutes a demand." *Id.* at 93. "Awards of [prejudgment] interest are not discretionary; if the statute applies, the trial court must award [prejudgment] interest." *Assurance*, 604 S.W.3d at 772 (citation omitted).

On appeal, the only element for a mandatory award of statutory prejudgment interest that is at issue is whether Karr's breach of contract claims were liquidated or

71

capable of ascertainment. "A prevailing party is not entitled to prejudgment interest on unliquidated damage claims because the defending party does not know the amount owed and, thus, is not in default for failing to pay." *Jablonski v. Barton Mut. Ins. Co.*, 291 S.W.3d 345, 350 (Mo. App. W.D. 2009) (citation omitted). "To be liquidated, the amount due must be fixed and determined *or readily ascertainable by computation or a recognized standard*." *Nelson*, 560 S.W.3d at 92 (emphasis added) (citation omitted). "Damages may be ascertainable even if there is a dispute over monetary value *or the parties' experts compute different estimates of loss*. . . . The fact that a party denies liability or defends against a claim does not preclude recovery of prejudgment interest." *Id.* (emphasis added) (citation omitted).

Here, Karr asserted three breach of contract claims, each of which was grounded in an assertion that the COI rate KCL used to determine the cost of insurance deducted from monthly cash values was overstated. The breach of contract claims inherently overlapped so that the jury's verdict as to each yielded (in effect) a single damage award in the amount of $28,362,830.96. Count I of the amended petition asserted that COI rates could only be based on mortality factors but had been improperly calculated based on non-mortality factors like profit generation and expense recovery. Count II of the amended petition asserted that the Polices only permit the recovery of expenses from a cash value deduction in the amount of the monthly expense charge expressed in the Policies such that the inclusion of expense recovery in the determined monthly COI rate was a breach of the Policies. And Count III of the amended petition alleged that even as to the mortality factors properly considered in determining monthly COI rates, KCL

72

improperly failed to give policyholders credit for KCL's expectations as to future mortality experience by not reducing COI rates when mortality expectations improved. Collectively, these breach of contract claims required damages to be calculated by comparing the COI rate actually used by KCL in each month for every one of the Policies against the mortality assumptions that should have been used as the COI rate in each month for every one of the Policies. That is precisely the calculation S.W. employed in generating a Class-wide damage amount.

KCL argues that the measure of damages was in dispute, and that as a result, damages for breach of contract were not liquidated or readily ascertainable. But, the record belies KCL's contention. KCL agreed that breach of contract damages had to be calculated by subtracting from COI rates actually used the amount that should have been used. KCL thus agreed with Karr about the proper measure of damages but simply disagreed about which mortality assumption data should be used in the damage calculation formula. KCL elicited trial testimony that suggested mortality assumptions based on product pricing should have been used in the formula, and that criticized S.W.'s use of mortality assumption data provided by KCL in discovery but generated for purposes other than product pricing. The disagreement over which mortality assumptions should have been used, however, does not demonstrate that breach of contract damages were not liquidated or capable of ascertainment. *Nelson,* 560 S.W.3d at 92. (finding that a dispute over monetary value or the parties' experts computing different estimates does not preclude an award of prejudgment interest).

Although KCL relies on our Supreme Court's findings in *Am. Eagle Waste Indus., LLC v. St. Louis Cnty.* to support its proposition that a dispute as to the measure of damages precludes an award of prejudgment interest, this reliance is misguided. 379 S.W.3d 813, 835 (Mo. banc 2012). The Supreme Court found prejudgment interest unavailable when "the measure of damages was disputed ***and uncertain***." *See id.* (emphasis added). Here, the choice of mortality assumptions that should have been used in lieu of the COI rates actually used by KCL may have been disputed. But the measure of damages, which required mortality assumptions to be subtracted from the COI rates actually used, was neither disputed not uncertain.

Ironically, KCL admitted in its suggestions in opposition to Karr's motion requesting an award of prejudgment interest that "the damages awarded by the jury already included prejudgment interest." KCL is correct. However, that observation only serves to underscore the trial court's error in denying Karr's request for a prejudgment interest award.

The Policies required KCL to credit policyholders with interest on cash value balances at a contract rate. Because cash value balances were lower than they should have been because more was deducted monthly for the cost of insurance than the Policies permitted, it follows that Class members suffered damages in the amount of the overstatement of the COI rate and also in the amount of interest that would have been earned had the COI rate overstatement remained in each Class member's cash value. S.W. calculated this interest for every Policy in the Class either through the date a Policy terminated or was surrendered, or through February 28, 2021, (the last date for which

74

data was provided by KCL) for Policies that remained in force. As KCL notes, the damages awarded by the jury, which were in the precise amount of S.W.'s damage calculation, included S.W.'s prejudgment interest calculation. Notably, KCL did not object at trial that prejudgment interest should not have been included in the jury's damage award because breach of contract damages were not liquidated or capable of ascertainment.

Karr's motion sought an award of prejudgment interest that used the same method for calculating interest that S.W. employed, though Karr's motion picked up from the point where S.W.'s interest calculations ended and requested an award that continued through the date of entry of a final judgment. Karr thus sought an award of prejudgment interest from and after the date that Policies terminated or were surrendered prior to S.W.'s interest calculation,[27] and from and after the date of February 28, 2021 for Policies still in force at the time of S.W.'s interest calculation. The breach of contract damages against which this continuing prejudgment interest award is sought are no less liquidated or capable of ascertainment for the periods now sought by Karr than they were for the periods included in S.W.'s Class-wide damage calculation.

The trial court committed legal error when it denied Karr's request for an award of prejudgment interest. Karr and the Class are entitled to an award of prejudgment interest

---

[27]In *Vogt*, 963 F.3d at 776, the Eighth Circuit remanded for an additional prejudgment interest calculation for terminated or surrendered policies holding that policyholders were entitled to prejudgment interest at the contract rate "up until the date of [final] judgment, not merely up until the date of termination or surrender" of their policy where the damages model did not include an interest calculation "beyond the date of termination or surrender of a given policy").

calculated at the contract rate set forth in the Policies from and after the date that any of the Policies terminated or were surrendered prior to S.W.'s interest calculation, and from and after the date of February 28, 2021, for Policies still in force at the time of S.W.'s interest calculation with that interest calculation continuing to August 24, 2023, the day of the final Judgment. We remand this matter to the trial court to calculate a prejudgment interest award accordingly and to amend the Judgment to reflect that award.[28]

Karr's point on appeal is granted.

---

[28]The Judgment awarded post-Judgment interest at the statutory rate from and after the date of the Judgment's entry, August 24, 2023. Our Opinion does not alter this award. Although we are directing the trial court to amend the Judgment to reflect an award of prejudgment interest, the Judgment's award of post-Judgment interest is not affected by our Opinion, and will apply to the total amount of the Judgment, as amended, to be calculated from and after August 24, 2023, since the Judgment should have included a prejudgment interest award.

## CONCLUSION

The trial court's May 10, 2023 Interim Judgment is reversed to the extent it denied an award of prejudgment interest. This matter is remanded to the trial court for the limited purposed of determining prejudgment interest to be awarded to Karr and the Class as set forth in this Opinion and for the limited purpose of amending the Judgment to reflect the award of prejudgment interest. In all other respects, the trial court's Judgment is affirmed.

_____
Cynthia L. Martin, Judge

All concur